[Criminal No. 501.  Filed June 7, 1921.]

[198 Pac. 288.]

# CHARLES MOON, Appellant, v. STATE, Respondent.

1. BURGLARY—EVIDENCE HELD TO SUSTAIN CONVICTION.—In burglary prosecution, evidence *held* to sustain conviction of first degree burglary.

2. CRIMINAL LAW—FINGER-PRINTS ADMISSIBLE.—Evidence of the correspondence of finger-print impressions for the purpose of identification, when introduced by qualified finger-print experts, is admissible in criminal cases; the weight and value of such testimony being for the jury.

3. CRIMINAL · LAW—FINGER-PRINT TEST HELD PROPER.—In burglary prosecution where the state introduced copies of finger-print impressions left at the scene of the crime to identify accused by comparison with his finger-prints, a demonstration or test of a finger-print expert with finger-prints of the jurymen *held* proper, under the rule giving to the trial court discretion as to experimental testimony.

4. CRIMINAL LAW—ALLOWING FINGER-PRINT EXPERT ON REDIRECT EXAMINATION TO RELATE EXPERIENCE IN OTHER CASES NOT ERROR.—In burglary prosecution, where accused was identified by his finger-prints, and, on searching cross-examination sought to impeach a witness as a finger-print expert, it was proper to allow the witness on redirect examination to relate his experience in other cases.

5. CRIMINAL LAW—ERROR IN QUESTIONING EXPERT ABOUT DETAILS OF OTHER CASES HELD NOT REVERSIBLE.—In qualifying a witness as a finger-print expert, error in questioning him about the particulars of other cases within his observation, which tended to introduce collateral issues, *held* of a technical nature not calling for reversal.

6. CRIMINAL LAW—INTRODUCTION OF· FINGER-PRINT PHOTOGRAPHS HELD NOT COMPELLING ACCUSED TO GIVE EVIDENCE AGAINST HIMSELF.—In burglary prosecution, where accused had voluntarily suffered the taking of his finger-print impressions which were photographed, and there was no claim of force or improper duress in taking the finger-prints, there was no violation of accused's constitutional

2.  On the question of admission of finger-prints as evidence, see notes in Ann Cas. 1917A, 417; 43 L. R. A. (N. S.) 1206; 3 B. R. C. 70.

On the question of identification by palm-print impression, see note in 3 A. L. R. 1706.

rights, as compelling him to give evidence against himself, in suffering the photograph to be introduced in evidence.

7. CRIMINAL LAW—PRESUMPTION ON APPEAL THAT RULING OF COURT WAS OBEYED.—In burglary prosecution, where, upon the introduction of a card containing a photograph of finger-prints of the accused previously taken by the San Francisco Bureau of Identification, which card also contained the criminal record of accused, the court ruled that the card would be admitted only upon covering the written part so as to render the printing thereon invisible, but the record did not show what was done in respect to concealing the printed matter when the card was introduced, it would be presumed on appeal that the ruling was obeyed.

APPEAL from a judgment of the Superior Court of the County of Cochise. Alfred C. Lockwood, Judge. Affirmed.

### STATEMENT OF FACTS.

The defendant has appealed from a judgment of the superior court of Cochise county, whereby he was convicted of the offense of burglary in the first degree, and pursuant to which he was sentenced to the state prison at Florence for an indeterminate period of not less than five nor more than fifteen years.

The facts are substantially as follows: John Treu's butcher-shop, situated in Bisbee, was burglarized, in the night-time, on the 6th of September, 1919. The safe in the shop was broken open and rifled and about $1,700 to $1,750, belonging to John Treu, was stolen. The cash register was removed a few feet from the counter and broken.

On the following morning the sheriff of Cochise county, together with others, carefully examined the premises at the scene of the burglary. It appears that the sheriff had had previous experience with finger-printing, and that he at once examined the doors of the safe and tools and other surfaces upon which he might reasonably expect to develop finger-prints; that among other things he discovered finger-

prints upon a porcelain slab on the front of the cash register which had been removed from the counter to the floor; that upon the development of the finger-prints upon this porcelain slab it was seen that a right hand had been laid upon this slab leaving the impression of four fingers, the entire print being sufficiently clear to distinguish the impression of the four fingers. However, the impression of two of the fingers, to wit, the index and little fingers, were blurred beyond possibility of identification. The print of the middle finger was blurred at the center, but on development well-defined ridges were found along the margin of this finger-print. The print of the ring or third finger, however, was exceptionally perfect—perfect in the sense that it was approximately a complete and perfect picture of what is technically called a "dab" impression of the end of the ring finger of the right hand. The officer caused the finger-prints to be carefully photographed by a competent photographer and the photograph of the print, together with the original slab, was positively identified and introduced in evidence in the case. One of the officers, who aided in the preliminary examination of the premises, discovered a piece of human skin adhering to a closet door situated alongside the safe which had been broken open; that this piece of skin which he found was bloody, and that drops of blood were found upon the closet door at and about the place where the piece of human skin adhered to the door; that blood was spattered over the front door of the safe and about the interior of the safe, so that it was obvious that the same person who had rifled the safe had injured some part of his hand, and that working about and in the safe the wound had bled sufficiently to have sprinkled drops of blood.

The officers at once made a search about the town for a man whose hand had been hurt, and soon ascertained that the defendant had an injured hand, and he was thereupon arrested and taken to the sheriff's office, where his hand was examined and finger-prints taken without any objection upon his part.

Upon examining the defendant's hand it was noticed that there was a similarity between the wound on his hand and the piece of skin found at Treu's butcher-shop. One of the officers brought the piece of skin and compared it with the wound. The piece of skin was submitted to a doctor, who also compared it with the wound. Both the officer and the doctor testified that the piece of skin conformed to the wound upon the right hand of the defendant.

Enlargements of the photograph of the finger-print on the porcelain slab and of the actual finger-print of the defendant were made for the purposes of comparison and submitted to five finger-print experts, each of whom testified that the finger-print upon the porcelain slab was made by the hand of the defendant.

Mr. Louis B. Whitney and Mr. Alexander B. Baker, for Appellant.

The Attorney General of Arizona and Mr. R. N. French, County Attorney, for the State.

BAKER, J. (After Stating the Facts as Above.)— Error is assigned upon the usual ground that the evidence is insufficient upon which to base the conviction or sustain the judgment. After a very careful review of the evidence in the case, we fail to see any merit in the assignment. The evidence for the prosecution rests principally upon the correspondence or exactness of certain "finger-prints." This evi-

dence was introduced by several expert witnesses, who testified in detail as to their study of and inquiry into the subject of finger-prints as a means of identification. They claimed to have made a close study of the subject, to have had extensive, practical experience in the comparison of finger-print impressions, and to be able by comparison of enlarged photographs of finger-prints to determine questions of identity, claiming that it furnished an accurate means thereof, since "never in the world were there two sets that exactly corresponded." The experts agreed in their testimony that the admitted finger-print impressions of the defendant corresponded exactly with the finger-print impressions appearing upon the porcelain slab of the cash register which the proof showed had been attempted to be rifled at the time the safe was burglarized and the money stolen, and that these impressions were made by the same person. The additional evidence that the defendant had a bleeding wound upon his right hand, early in the morning after the commission of the burglary, and that the piece of human skin found adhering to the closet door situated alongside of the safe which had been broken open corresponded with the wound upon the defendant's hand, tended also to connect the defendant with the commission of the crime.

The defendant does not deny that the safe was burglarized, but he claims that during the whole time he was so far from the place where the crime was committed that he could not have participated in it. He attempts to explain the wound on his hand by saying that he received it while cutting some kindling on the morning after the burglary. Of course, evidence of this character conflicted with the evidence for the prosecution, but it was for the jury to settle this conflict. There can be no doubt, if the evidence for the prosecution was true, that the defendant was

present at the scene of the burglary and committed the crime.

The case is one of first impression in the courts of the state and is a novel one, although students of the science claim that the use of finger-prints in making personal identification was known to the Chinese before the birth of Christ. They claim that a finger-print is "an unforgeable signature" and is the most positive and certain means of identification known to men. Mr. Frederick A. Brayley, in his work entitled "Finger Prints Identification," uses the following emotional language:

" 'God's finger-print language,' the voiceless speech and the indelible writing imprinted on the fingers, hand palms, and foot soles of humanity by the all-wise Creator for some good and useful purpose in the structure, regulation, and well-being of the human body, has been utilized for ages before the civilization of Europe as a means of identification by the Chinese, and who shall say is not a part of the plan of the Creator for the ultimate elimination of crime by means of surrounding the evilly disposed by safeguards of prevention, and for the unquestionable evidence of identity in all cases where such is necessary, whether it be in wills, deeds, insurance, or commercial mediums of finance, as well as in the discovering and identification of lawbreakers."

It seems to be well settled, both in England and in this country, that evidence of the correspondence of finger-print impressions for the purpose of identification, when introduced by qualified finger-print experts, is admissible in criminal cases; the weight and value of such testimony always being a question for the jury.

The historical facts and the more recent legal decisions upon the subject are collated in a very able opinion handed down by Wadhams, J., in the case of *People* v. *Sallow,* reported in 100 Misc. Rep. 447,

165 N. Y. Supp. 915–925, which we here reproduce in part:

" . . . Scientific authority declares that finger-prints are reliable as a means of identification. 10 Ency. Brit. (11th Ed.) 376. The first recorded finger-prints were used as a manual seal, to give a personal mark of authenticity to documents. Such prints are found in the Assyrian clay tablets in the British Museum. Finger-prints were first used to record the identity of individuals officially by Sir William Herschel, in Bengal, to check forgeries by natives in India in 1858. C. Ainsworth Mitchell, in 'Science and the Criminal,' 1911, p. .51. Finger-print records have been constantly used as a basis of information for the courts since Sir Francis Galton proved that the papillary ridges which cover the inner surface of the hands and the soles of the feet form patterns, the main details of which remain the same from the sixth month of the embryonic period until decomposition sets in after death, and Sir Edward Henry, the head of the Metropolitan Police Force of London, formulated a practical system of classification, subsequently simplified by an Argentine named Vucetich. The system has been in general use in the criminal courts in England since 1891. It is claimed that by means of finger-prints the metropolitan police force of London, during the 13 years from 1901 to 1914, have made over 103,000 identifications, and the Magistrates' Court of New York City during the 4 years from 1911 to 1915 have made 31,000 identifications, without error. Report of Alfred H. Hart, Supervisor, Fingerprint Bureau, Ann. Rep. N. Y. City Magistrates' Courts, 1915. Their value has been recognized by banks and other corporations, passport bureaus of foreign governments, and civil service commissions as a certain protection against impersonation.

"It was held in 1909 by the Lord Chief Justice of England that the court may accept the evidence of finger-prints, though it be the sole ground of identification. *Castleton's Case,* 3 Crim. App. C. 74. In *People* v. *Jennings,* 252 Ill. 534, 549, 96 N. E. 1077, 1082 (43 L. R. A. [N. S.] 1206), Mr. Chief Justice

Carter, in holding such evidence admissible, states that— 'There is a scientific basis for the system of finger-print identification, and that the courts are justified in admitting this class of evidence; that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it.'

"And in *People* v. *Roach,* 215 N. Y. 592, at page 604, 109 N. E. 618, page 623 (Ann. Cas. 1917A, 410), Mr. Justice Seabury said: 'In view of the progress that has been made by scientific students and those charged with the detection of crime in the police departments of the larger cities of the world, in effecting identification by means of finger-print impressions, we cannot rule as a matter of law that such evidence is incompetent. Nor does the fact that it presents to the court novel questions preclude its admission upon common-law principles. The same thing was true of typewriting, photography, and X-ray photographs, and yet the reception of such evidence is a common occurrence in our courts.' "

See, also, the recent case of *State* v. *Kuhl,* 42 Nev. 185, 3 A. R. L. 1694, 175 Pac. 190. See further, *State* v. *Cerciello,* 86 N. J. L. 309, 52 L. R. A. (N. S.) 1010, 90 Atl. 1112; *State* v. *Connors,* 87 N. J. L. 419, 94 Atl. 812; *Parker* v. *Rex,* 14 C. L. R. (Austr.) 681, 3 B. R. C. 68; *Rex* v. *Morris,* St. R. Qd. 274.

We are cited to the case of *McGarry* v. *State,* 82 Tex. Cr. 597, 200 S. W. 527, where it is held that finger-print impressions were insufficient to support the conviction. The case, however, is clearly distinguishable from the present case. It was a burglary case in which entry was made by breaking window-glass from the outside and unfastening the door from the inside. The defendant's finger-prints were found upon the window-glass and identified with substantial certainty, and he was convicted upon that evidence alone. The evidence showed that this window was in a public place and that there were

other finger-prints upon the window-glass. The court, in reviewing the case, held that it was possible for the defendant to have innocently placed his hand upon the window-glass, and that consequently his presence at the window was a fact that was not inconsistent with the hypothesis of his innocence. But it cannot be said of this defendant that his presence at the cash register, as necessarily found by the jury, was consistent with any hypothesis of his innocence. The cash register was not in a public place. It had been removed and placed on the floor in an effort to rifle it. There were no finger-prints other than the alleged finger-prints of the defendant upon the porcelain slab. The facts of the two cases are entirely different.

Complaint is made of alleged errors of the trial judge in the admission of evidence. The expert witness Sanders was permitted to make the test of pairing the finger-prints of the twelve jurymen which consisted of taking two prints in duplicate on separate cardboards of the finger-prints of the twelve jurymen in the absence of the expert, who upon returning to the room, in the presence of the court and jury, developed the finger-prints of the jurymen by means of finger-print powder and correctly paired the cards off by comparing the finger-prints as developed. It is not claimed that the test was made under conditions different from the conditions actually existing in the case, or that there was any trick or device about the test or anything which smacked of a sleight-of-hand performance. It seems to have been a fair proposition, fairly conducted, and tended, as we think, to illustrate the methods of the system of finger-print identification and the truth of the claim that invisible finger-prints can be developed and identity of the maker revealed by simple process to positive certainty. In the present instance the evi-

dentiary value of the abstract explanation of the methods of the system of developing finger-print impressions given by the expert witnesses was probably difficult for the jury to grasp. To most of us it is very hard to conceive that there cannot be two fingers that are exactly alike. But as the methods of the system were susceptible of actual demonstration by means of a test, we can see no reason why such test should not be made. Upon the point we reproduce the reasoning of counsel for the state:

"To a layman, unsophisticated and incredulous, the idea that a finger laid on a clean sheet of paper, leaving no visible trace, thereby leaves a signature upon that paper, absolutely and positively is a fact startling enough, but to see that finger-print developed under the finger-print powder is a demonstration impressive and convincing. It might well be that until a juryman witnessed this demonstration he would never believe that a plain porcelain slab would reveal the incriminating finger-print, but having seen their own finger-prints developed from invisible impressions on sheets of paper, it was no longer a question of speculation; it was to the jurymen a fact as commonplace as radium or wireless or flying in the air."

For obvious reasons the admission of experimental testimony must largely rest in the discretion of the trial judge, and the exercise of this discretion will not be controlled unless it is manifestly abused.

The expert witness Evans, over the objection of the defendant, was permitted, on redirect examination, to detail the circumstances and facts in certain other cases, in which he was engaged and in which finger-print evidence was used. This procedure is assigned as error. The record discloses that the defendant on searching cross-examination sought to impeach the qualification of the witness as an expert upon the subject of comparing finger-print impressions, and thus throw doubt upon his testimony. Through-

out the trial it seems to have been insisted that there was no such science as that of finger-print identification. Under such circumstances, the value and weight of the testimony of the expert witness became a question of prime importance before the jury, and we therefore think it was proper procedure to allow the witness on redirect examination to relate his experience in other cases in which he had been employed as a foundation for his opinion as an expert that the finger-print impressions on the porcelain slab corresponded with the finger-print impressions of the defendant. We do not think that the order in which the testimony was elicited is of great importance. The real question is: Was it admissible at all? Mr. Wigmore, in his work on Evidence (volume 1, paragraph 555), under the convenient heading of "General Theory of Experiential Capacity," says:

"In experience, then, are included all the processes —the continual use of the faculties, the habit and practice of an occupation, special study, professional training; and the rest—which contribute to produce a fitness to acquire accurate knowledge upon a given subject."

Again, at paragraph 562 of the same volume, the learned author says:

"The experiential qualifications of a witness are usually established by his own testimony reciting the facts of his career and special experience."

The facts and circumstances of the other cases were too minutely recited and should have been omitted. In this sense the procedure was probably violative of the rule that an expert may not be questioned about the particulars of other cases which have happened to come within his observation because it tends to introduce collateral issues (Rogers on Expert Testimony, par. 35), but the error was

of a technical nature under the peculiar facts of the case, and does not, in our opinion, call for a reversal of the judgment of conviction.

The introduction of the finger-print photographs for comparison or identification is assigned as error. The question of using finger-print photographs was raised in the case of *People* v. *Jennings, supra,* where the court said:

"When photography was first introduced it was seriously questioned whether pictures thus created could properly be introduced in evidence, but this method of proof, as well as by means of X-rays and the microscope, is now admitted without question. Wharton on Criminal Evidence (8th ed.), § 544; 1 Wigmore on Evidence, § 795; Rogers on Expert Testimony (2d ed.), § 140; Jones on Evidence (2d ed.), § 581."

It is objected that it was error to admit in evidence the photograph of the finger-prints of the defendant for the reason that a defendant under the Constitution cannot be compelled to give evidence against himself. But the uncontradicted evidence shows that the defendant voluntarily suffered his finger-print impressions to be taken which were photographed. There is no claim that any force or improper duress was used in taking the finger-prints. It is clear that there was no violation of the constitutional rights of the defendant in suffering the photograph to be introduced in evidence. *People* v. *Sallow, supra.*

An assignment of error is based upon the introduction in evidence of the state's Exhibits "PP" and "QQ." Exhibit "QQ" is a photograph of the defendant. While the photograph was immaterial and its introduction superfluous and useless, yet we cannot perceive how its introduction could possibly be harmful to the defendant. "PP" is a photograph of the finger-print impressions of the defendant taken in the San Francisco Bureau of Iden-

tification in March, 1918. On the opposite page of the card upon which the finger-print impressions appear, and also under the finger-print impressions on the same side of the card, appears the criminal record of the defendant, showing that he had been arrested for an assault and attempt to murder, etc. The contention here is that this exhibit tended to show the commission of a different offense than that charged in the information and had no connection with the case being tried and was prejudicial to the defendant. Upon a critical examination of the record, we find that when the exhibit was offered in evidence the court said:

"The ruling is the finger-prints will be admitted and the card on which they are will be admitted only upon the written part being covered in such manner as to render the printing thereon invisible."

What was actually done in respect to concealing the printed matter on the card is not disclosed by the record. We must presume, however, that the ruling of the court was obeyed; there being nothing to the contrary. Hence, we conclude that the jury never saw the printed matter on the card, and had no knowledge thereof.

The other questions argued by counsel have not been overlooked, but are not of controlling importance. We find no fault with the instructions. They fairly state the law and cover every phase of the case. The record, which, together with the able argument of counsel for the defendant, is quite voluminous, has had careful and thorough consideration, and we are not convinced that the defendant was denied a fair trial in the court below.

Finding no error, its judgment is therefore affirmed.

ROSS, C. J., and McALISTER, J., concur.