## NEWTON GRICE V. THE STATE.

No. 21458. Delivered April 9, 1941.
Rehearing Denied May 21, 1941.

The opinion states the case.

*Tom L. Robinson,* of Gatesville, for appellant.

*Lloyd W. Davidson,* State's Attorney of Austin, for the State, on submission.

6

BEAUCHAMP, Judge.

The appellant was convicted upon an indictment charging burglary, alleged to have been committed in the city of Hamilton on September 15, 1940. The sentence assessed was two years in the penitentiary.

The facts connecting appellant with the offense as produced by the State, so far as it is essential to a discussion of the question before us, may be summarized as follows:

A cafe business was conducted by Huddleston in the house in question. In addition to the regular front entrance there was also an entrance to the building from the rear, through which the public was invited to pass and which entrance was generally patronized. Appellant lived in the town and had been working three or four doors from this place of business in a newspaper office. He was a frequent visitor to the cafe, entering both from the front and rear doors. The evidence shows, without dispute, that the place of business was closed on the night of the burglary and the rear doors were fastened on the inside. One of the doors had three panes of glass which were fastened in place with a molding from one half to three fourths of an inch in width. This molding was removed by the burglar and the glass taken out of the door was placed in a washroom on the inside of the building. The State's theory is that the party making the entry reached in through the opening left by the removal of the glass and unlatched the door and opened it to permit him to enter. A night watchman testified that the door was still closed at one o'clock in the morning. At about 4:30 an employee came to open the business and discovered the door open and that a burglary had been committed. He at once notified the proprietor, who called the watchman and then the sheriff. They discovered the pane of glass and the sheriff took charge of it, handling it so as to prevent destroying any fingerprints thereon, and carried it to the Department of Public Safety, in Austin, where an examination by experts disclosed a fingerprint on the glass extending into that portion which was covered by the molding while in place

in the door. This was, of necessity, made on the glass at the time of the entry. This fingerprint was photographed and enlarged and by an expert compared with the known fingerprint of appellant which had been secured by the sheriff and furnished to the expert. Enlarged·photographs, together with the negative from which they were made, were introduced in evidence and a picture of a section of the known fingerprint of appellant is herewith shown as our Figure No. One:

We also show a like section of a picture of the fingerprint taken from the glass as introduced in evidence as our Figure No. Two:

Testifying for the State as an expert, J. O. McGuire discusses the two pictures shown here as Figures I and II, showing the points of identity as numbered from (1) to (18), and concludes that the latent impression on the glass was identical with the impression known to be that of appellant. There is no denial that the pictures are identical if properly and correctly taken from the glass, the only contest being an intimation on cross examination that a better method of lifting the prints might be used, or that there could be errors in the print.

The only other evidence than the finger prints which may aid in connecting appellant with the offense was the testimony

of an officer that he saw the appellant on the streets in the city of Hamilton during a late hour of the night. He is not shown to have been seen at or about the building burglarized.

Appellant pleaded not guilty and set up the defense of an alibi. His father and another relative testified that they made a trip to Fort Worth, which was inconsistent with his presence in Hamilton at the hour of the burglary. Other witnesses also corroborated these. A number of citizens were called as witnesses and testified as to appellant's good reputation.

We are, therefore, confronted with the problem of deciding for the first time whether or not identification by finger prints, unaided by other evidence, is sufficiently reliable, when believed by a jury, to warrant them in concluding that the accused was present and made the finger prints.

The expert testifying for the State says the finger print found on the glass is identical with that of the appellant, and testified as to the method and reasons for such identification. Whether or not it was made by the accused, and all other deductions to follow from such finding by the jury, are conclusions which rest exclusively with the jury, regardless of any holding as to the admissibility and force of such testimony. Nevertheless, we understand it to be within the rule to permit an expert to say that in his opinion the print could not have been made by any other person.

As noted, the characteristic markings shown in the figures are referred to by the use of arrows numbered from one to eighteen, and the expert testifies that there are eighteen points identical on the two prints, while nothing is found on one different to that found on the other. There is no short line or ridge, no forking of line, no break in the line, and no formation of a ridge found on one that is contradictory of the other. He says that from nine to twelve such identifying characteristics are generally accepted as being sufficient to warrant positive identification, while he has pointed out eighteen. If there is another or others in the vicinity with identical finger prints, it would be easy to conclude that the comparison made would only be a circumstance which may be considered along with other evidence pointing to appellant's guilt. In that event, with the state of this record, we would not feel like holding that the evidence met the requirements of law for circumstantial evidence for there would not be evidence to exclude all others. If there is but one person having this exact

finger print, and appellant is shown to be that person, then it may well be reasoned that the evidence points to appellant as the party who entered the building to the exclusion of all others.

In brief, if the State's contention is correct that no two people have the same finger prints, and the court is justified in judicially accepting as a scientific truth such fact, or it is sufficiently proven by the evidence introduced in this case, then the judgment should be affirmed. If not, it must be reversed.

The discussions on this subject in the written opinions, and the recognition which the courts may give it will be given as it appears in the several cases hereinafter treated.

The State's witness said on cross-examination that the number of prints which would be required to find a duplication would be a figure so high that he would have no name for it; that it would be in the "billions and trillions or something." Counsel for appellant, in a very intelligent cross-examination, apparently concedes that a duplication might occur in sixty-four million people. At least, he presented a book whose author so taught. The State's witness would not agree to a figure that small.

We might observe with some force at this time that the question is one capable of ascertainment to a satisfactory degree at least. This is not always true of scientific deductions, many of which must be noticed judicially. For many years cases of this character have been in courts, before legislative bodies, and others interested with the claim that no duplication can be found. In various branches of governmental activities finger prints are taken by the multiplied thousands. They have been assembled, classified and indexed systematically and if there are two alike in the great number of which there is authentic record and available to litigants and others interested in the subject, that fact could be definitely proven and the claims of experts successfully contradicted. So far as we have been able to tell, no such contention has ever been so rebutted, and appellant does not even attempt to do so in this case. The question specifically and definitely before us is whether or not the evidence given is sufficient to establish identity. Appellant contends that it is not, but the record is silent as to any perceptible difference, and rests solely upon the effort to weaken the State's evidence.

While the subject is one for expert testimony, at the same time there is no rule excluding the physical facts pointed out which may be viewed and understood by the layman. The

markings and characteristics in the eighteen points relied upon appear to us to be of such nature that they are understood even without the interpretation of an expert. In this connection we may observe that from the authorities we learn that the science of identification by finger prints is as old · as the Chinese civilization, but that in recent years there has been great development in its use and usefulness because of modern invention which permits the lifting of the finger print under many conditions; the photographing, magnifying and preservation, and particularly in a satisfactory system of classification. These things have given rise to a more frequent appearance of such testimony in litigated cases and of more carefully considered opinions treating the subject. We must now view it in the light of such decisions.

While appreciating the caution and care exercised by this court in the years that have passed, we must know that in the progress of things opinions early expressed may not be an infallible guide at this time, especially in view of the fact that no case seems to have called for the determination of the exact question here presented. It is a general rule, which this court respects, that judicial knowledge will be taken of those things which are known, or should be generally known, within the jurisdiction of the court, and that judicial knowledge will be extended so as to keep proper pace with the rapid advancement of art, science and general knowledge when the facts are of such age and duration as to become a part of the common knowledge of well informed persons. Moreno v. State, 143 S. W. 156; Minnesota v. Barber, 136 U. S. 321, 10 Sup. Ct. 862, 34 L: Ed. 455; McDaniel v. State, 76 Ala. 1; People v. Mayes, 113 Cal. 618, 45 Pac. 860; State v. Main, 69 Conn. 133, 37 Atl. 80, 36 L. R. A. 623; 61 Am. St. Rep. 30; State v. Braskamp, 87 Iowa, 590, 54 N. W. 532; Kilpatrick v. Commonwealth, 31 Pa. 198; Austin v. State, 101 Tenn. 563, 48 S. W. 305, 50 L. R. A. 478, 70 Am. St. Rep. 703. 17 Tex. Jur. 168.

An early case on this subject is that of McGarry v. State, 200 S. W. 527, written in the year 1918, in which Judge Morrow states that there is no precedent at that time to be found in the courts of our State for him to follow, and quotes at great length and relies upon the opinion of the Supreme Court of Illinois in the case of People v. Jennings, 96 N. E. 1081, a case which will be hereinafter noticed further. While he held that the evidence of an expert as to the finger printing was admissible, at the same time he concluded that it was insuffi-

cient to support a conviction. His conclusion was based on the fact in that case that the finger prints in question were taken from a window at a depot where the station had been burglarized. It was shown that on the night of the burglary appellant and others were lawfully on the premises and his finger prints could have been placed there innocently. It was upon this theory that the court held the evidence insufficient to support a conviction, in the absence of other incriminating testimony. Also there were other finger prints on the same glass with no evidence to exclude them as the guilty party's.

Graves v. The State, 119 T. C. R. 68; 43 S. W. (2d) 953, decided by this court in 1931, is a case in which the State relied on the identification of the burglar by finger prints. The facts disclosed that accused had been employed by the Fry Rubber Company and at times, at least, was called upon or permitted to clean out the office where was situated a safe by the side of which was a metal file cabinet. On the back of a calendar hanging nearby was the combination to the safe. His employment with the company ceased, and some ten days thereafter the office was burglarized and the safe opened and an amount of money extracted therefrom. Finger prints were found on the metal safe and an expert identified them as the finger prints of the accused. Other parties worked in the office; others knew about the combination to the safe and none of them testified that they did not commit the burglary and it is not shown that there were not other finger prints which might be identified as the finger prints of other parties. Following the theory that the accused might have deposited the finger prints at a time when he was lawfully in the office, this court held that the identification was not inconsistent with his innocence under the given circumstances. The case was reversed on that ground.

Weathered v. State, 119 T. C. R. 90; 46 S. W. (2d) 701, was decided in the year 1932 by this court. The office of the tax collector of Taylor County was burglarized, the entry being made through an adjoining office. Near the burglarized safe was a broken flashlight which revealed the finger prints identified as those of the accused. It was shown that the accused's garage was burglarized a few days before and that some tools and a flashlight were taken therefrom. The reasoning in this case on the subject of identification of the finger print is brief, but apparently follows that of the Graves case, supra. The facts and circumstances were held to be insufficient

to exclude every other reasonable hypothesis except that of the guilt of the accused and the case was reversed. Apparently no great weight was given to the identification of accused by reason of the finger prints.

In Davis v. State, 66 S. W. (2d) 343, written in 1933, the opinion was expressed that in Graves v. The State, supra, McGarry v. State, supra, and Weathered v. State, supra, the court had said that, "finger prints, while admissible, are not conclusive as to the identity of an individual." It will be observed that in this opinion the reversal was had on other grounds, and the evidence of finger prints was not a controlling factor. It is easy, upon an analysis of the case, to see that the quoted statement was not an essential conclusion to the determination of the case under consideration and, likewise, it is not an accurate conclusion as to what was decided in the three cases referred to. This doctrine, however, was recalled in the case of Conners v. State, 115 S. W. (2d) 681, decided in 1938, which appears to be the last expression by this court on the subject, and the Davis case is the sole authority there given for the conclusion reached.

We are, therefore, confronted with the responsibility of deciding whether or not this court will hold that identification of finger prints may, when the evidence is accepted by the jury, be conclusive as to the identity of the individual making them or only a circumstance to be considered with other circumstances to identify him. We must not confuse the question before us. When positive proof of the presence of an individual at a place is made, his presence is frequently nothing more than a circumstance pointing to his guilt of a crime committed at or near such place. The question we have is whether or not the identity of finger prints may be used as sufficient identification of the individual or only a circumstance taken with others to identify him.

In view of the history given in the record before us of the development of the science of identification by finger prints and the claim made that no two persons have identical ridge formations, and in view of the known progress made in this science following the development of methods for taking finger prints, for their classification and for the general use now being made of this science by our government, as well as that of many other governments, we have thought it essential at this time to review the decisions of other courts of our nation, both state and federal, in order to determine the judicial recog-

nition now given to this science and thereby, for the first time, form a definite and certain policy and rule for the recognition which this court shall give to it.

We may here observe that a thorough investigation of these cases reveals that the courts have uniformly recognized, either by direct and positive pronouncement or by implication, the accuracy of identification by finger printing and that, while the assertion has been insistently made that no two people have identical finger markings, we have found no case of record in which the defense has produced an exception or has attempted to refute such testimony by an example of two or more people with identical finger prints. Generally this assertion is not even challenged.

In this instant case the witness who testified in behalf of the State was ably cross examined by an attorney for appellant who showed himself to be well versed in the science and who has greatly assisted this court by making a thorough and intelligent record by the manner and efficiency of his examination, yet he makes no claim that two people have identical skin formations on their fingers or that there is a difference between the imprint found on the glass and the known imprint of appellant's finger so far as the things pointed out and relied upon are concerned. Under all the rules, if he had been able to show one definite exception or variance between the two prints, it is conceded that he would prevail even though the State had pointed out eighteen common characteristics.

In Garcia, et al, v. State, 229 Pac. 103, the Supreme Court of Arizona had under consideration a murder case in which the finger prints of a party were taken from a piece of broken glass from the front door of a building, and held the testimony identifying Garcia to be admissible. In passing it noticed also that the act of the officers in causing him to have his finger prints made was not compelling him to testify against himself in violation of the Constitution of the United States.

In State v. Martinez, 250 Pac. 239, the Supreme Court of Idaho had before it the novel question of whether or not the State may be permitted to prove the identity of the appellant's first wife, who was living at the time of his second marriage without a divorce, by the use of finger prints and her signature. The court held the evidence to be admissible and recognized the testimony so identifying her.

The Supreme Court of the State of Washington, in State v.

Bolen, 254 Pac. 445, in the year 1927, held that war records of the finger prints of the accused were admissible for the purpose of identification, thus effectively giving recognition to this character of evidence.

State v. Smith, 273 Pac. 323, was decided by the Supreme Court of Oregon in 1929. The indictment contained an allegation of other previous convictions upon which an enhanced penalty was sought. For the purpose of identifying the accused the State offered photographs and finger prints taken from a prison record. The opinion holds this testimony to be admissible, giving specific recognition to the accuracy of the science of identification by finger prints.

In People v. Chimovitz, 211 N. W. 650, the Supreme Court of Michigan sustained the trial court in permitting an expert to pair finger prints of jurors for the purpose of illustrating and demonstrating the system of finger print identification and held that it was not an abuse of the court's discretion where the purpose was to show that finger prints on glass jars in a building containing gasoline and kerosene were those of the accused, thus giving assent to the doctrine of the admissiblity of the evidence for the purpose of identification, not as a circumstance but as a fact.

The Supreme Court of Iowa has held in the opinion of State v. Steffen, 226 N. W. 46, 1929, that where finger prints found on pieces of window glass were the finger prints of the accused that the pieces of glass with the finger prints became admissible for the purpose of identifying the accused as a perpetrator of the crime. The opinion cites as authority People v. Jennings, an Illinois case; also, State v. Cerciello (N. J.) 90 A. 1112; 52 L. R. A. (N. S.) 1010; State v. Connors (N. J.) 94 A., 812; People v. Roach, 109 N. E. 618.

The Court of Errors and Appeals of the State of New Jersey has recognized the value of finger print identification in the case of Lambel v. State, 114 A. 346, and further held that photographs of finger prints taken from an automobile door were admissible without the production of the door of the automobile in court. The opinion states that there is a scientific basis for the system of finger print identification; that the courts are justified in admitting this class of evidence, and that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it. The court takes notice of the testimony of an expert in the case who calls attention to a statement in Encyclopedia

Britannica to the effect that the probability that two persons having a similar or like finger print would not occur once in sixty two billion people. Such statements frequently use a much larger figure may be noted in a number of the cases to which we will herein refer. So far as we have been able to discover, there is no evidence contradicting such conclusions.

The Supreme Court of Errors of the State of Connecticut in a long discussion of the subject in the case of State v. Chin Lung, 139 A. 91, concludes as follows:

"The utility of finger print evidence as a system of identification is universally admitted in this country, and its admission when competent, relevant, and material has long been the accepted ruling of our courts. People v. Roach, 215 N. Y. 592, 109 N. E. 618, Ann. Cas. 1917A, 410; State v. Connors, 87 N. J. Law, 419, 94 A. 812.

"The trial court, upon seasonable objection, could not have properly excluded this evidence. Nor could it properly have removed it from the consideration of the jury. We do not attempt to follow the argument of counsel for the accused further. Nothing which they could have done could have excluded this evidence, and nothing could have removed or lessened its significance except other evidence tending to disprove it or destroy its reliability; counsel for the accused offered no evidence, in contradiction or explanation of the finger print evidence, or the photographs in connection with this evidence offered by the state. If the evidence, if believed, tended strongly to point to the guilty of Soo, it was a factual prejudice, just as the revolver and bullets were a factual prejudice."

From the case of State v. Lapan, 141 A. 686, we quote the following language from the opinion by the Supreme Court of the State of Vermont:

"To so much of the statement as referred to its being 'a generally recognized science,' the respondent excepted. No ground of exception was then specified, and the only one here urged is that no evidence had been given 'as to the state of this so-called science.' No such evidence was required. *The subject is one of the things that does not have to be proved. That the system of finger print identification rests upon a substantial scientific basis and that it is in general use in criminal trials are facts of which courts take judicial notice.* People v. Jennings, 252 Ill., 534, 96 N. E. 1077, 43 L. R. A. (N. S.) 1206, 1212; Lamble v. State, 96 N. J. Law, 231, 114 A. 346, 348.

"See, also Moon v. State, 22 Ariz. 418, 198 P. 288, 16 A. L. R. 362, 367, wherein People v. Jennings is quoted on this point with apparent approval, and Parker v. The King (Vict. S. C.) 3 B. R. C. 68, 69, *wherein it is said that a finger print is in reality an unforgeable signature*—the doctrine of which was approved by this court in Davis v. Dunn, 90 Vt. 253, 259, 98 A. 81, Ann. Cas. 1918D, 994. This knowledge of the courts goes so far as to enable them to say, without proof, that the imprint of the palm side of the human hand, when fairly taken, presents reliable individual, and unchanging characteristics of the papillary ridges * * *."

The Supreme Court of Arkansas received the testimony of expert witnesses in the case of Hopkins v. State, 295 S. W. 361, to the effect that no two persons would have identical finger prints. This was received by the court on the theory that it was the statement of a fact by the witness based upon experience of multiplied thousands of tests and not upon opinion testimony. In this holding the court relied upon what is considered an interesting review, and development, of the study of finger prints by court opinions and annotations of text writers.

In the case of Duree, et al, v. U. S., 297 Fed. 70, in error to the district court of the United States for the western district of Oklahoma, Circuit Judge Kenyon held that the photographs of finger prints on a bottle were admissible in evidence, apparently assuming that the recognition of this character of evidence was so general as to require no discussion and no citation of authorities.

The Supreme Court of the State of Nevada held in State v. Kuhl, 175 Pac. 190, that an expert may testify positively as to the identity of two palm impressions rather than be limited to his belief or judgment. The court observed that if it were dealing with finger print impressions its course would be easy, "for the courts of this country, and of England as well, have paved the way for the recognition of this science as an evidentiary element in criminal prosecutions." The effect of the holding in that case was to give recognition to the fact that the papillary ridges, which are the instruments of finger print impressions, extend over the whole palmar surface. The opinion quotes from A. Brayley's book, entitled, "Finger Prints ldentification," when it refers to, "God's finger print language', the voiceless speech, and the indelible writing imprinted on the fingers, hand palms, and foot soles of humanity by the All-Wise

Creator for some good and useful purpose in the structure, regulation, and well-being of the human body." And then observes that it has also been utilized for ages before the civilization of Europe as a means of identification by the Chinese. The opinion quotes from an article in the Scientific American of August 19, 1911, wherein it is said, "No two finger prints are alike." The article quotes M. V. Balthazard in an address to the French Academy of Science in which the learned author says that if any finger print be divided into one hundred squares, each square will contain some distinctive mark. He figures the total number of combinations of the kinds of marks, branching or terminiation of ridges, in the 100 squares to be the 100th power of four and then says; "This is a number that no one can possibly imagine." Stated, it is: 1,606,937,974,174, 171,729,-761,809,705,564, 167,968,221,676,069,604,401,795,301,376.  T h e opinion accepting this as a scientific truth, taking note of it outside of the record of the case, agrees with the statement that no two finger prints are alike, and extends it to the palm of the hand in the application of the facts to the case under consideration, and observes that the author's interesting and instructive reasoning establishes the fact that when two finger prints concur in 17 out of the 100 squares into which it may be divided, it is practically certain that they were made by the same finger. The opinion also states that all the authors and writers to which it has referred agree, in effect, that the "friction skin is covered by breaking, forking, splitting ridges, which ridges form patterns and designs most irregular and individual," and quotes an author as saying that those features remain constant throughout the entire life and are too complicated to make a duplication of even a single ridge probable, and that a small area of friction skin, no matter where taken, is sufficient for an absolute and positive identification.

This very cautious and exhaustively prepared opinion refers to the case of Parker v. Rex, from the High Court of Australia, in which it is said with reference to the general recognition by courts and authorities of the individuality of the corrugations in the skin on the fingers of the human hand that, "A finger print is, therefore, in reality an unforgeable signature. That it is now recognized in a large part of the world and in some parts has, I think, been recognized for many centuries."

Note is taken also of decisions in the courts of India in 1904, and later dates, holding that the identity of the individual might be established by the opinion of experts testifying as to the identity of finger print impressions. Also, that

the courts of Great Britain have followed the accepted principle that scientific finger print identification was established and that evidence proving identity by this means should be received.

The author considers the opinions in People v. Jennings, 96 N. E. 1077; People v. Roach, 109 N. E. 618, and holds in harmony with them that the foundation was sufficiently laid for the testimony of the witnesses and that the evidence of these experts as to the identity of the palm print of the defendant with that found on a blood-smeared envelope was a proper subject for the consideration of the jury, and that the weight to be given to this testimony was for the jury to determine.

Another very exhaustive case on the subject frequently referred to by the courts and text writers is the case of Moon v. State of Arizona, 198 Pac. 288, opinion dated June 7, 1921. After quoting rather briefly from the legal opinions and scientific writings on the subject, the opinion says that the system has been in general use in the Criminal Courts of England since 1891, where the Metropolitan Police Force of London during a period of thirteen years, from 1901 to 1914, have made over 103,000 identifications, and also that the Magistrates Court of New York City, during four years from 1911 to 1915, have made 31,000 identifications without error. Note is also taken of the fact in the opinion that the value of fingerprint identification has been recognized by banks and other corporations, passport bureaus of foreign governments, and civil service commissions, as a "certain protection against impersonation." Reference is also made to an opinion in 1909 by the Lord Chief Justice of England to the effect that the court, "May accept the evidence of fingerprints, though it be the sole ground of identification."

A case with the same question of law involved and almost exactly the same facts as the instant case is that of Commonwealth v. Albright, 101 Pa. Superior Court Reports, page 317, (decided in 1931) from which we quote the following:

"We do not think it necessary to go into detailed discussion of the facts on which the science of identification by means of finger print impressions is based. Its accuracy and reliability are too well established to require elaborate confirmation at this time by the courts of this State. It is well settled that the papillary lines and markings on the fingers of every man, woman and child possess an individual character different

from those of any other person and that the chances that the finger prints of two different persons may be identical are infinitesimally remote. As early as 1893 a committee appointed by Mr. Asquith in England to inquire into the best means available for identifying habitual criminals agreed that 'for the purpose of proving identity, the finger prints examined and compared by an expert furnish a method far more certain' than any other.' "

In considering this question the writer of the opinion relies much on the very learned and exhaustive opinion of Justice Dowling of the Supreme Court, Appellate Division, Fourth Department, New York, dated May 3, 1939, reported in 12 N. Y. S. 2nd series, 635. We have referred to many of the authorities this opinion has relied on, and for that reason are not quoting at length from this New York opinion, but consider a fitting conclusion to this discussion a quotation from pages 637 and 638, the comment made on the case of Stacy v. State (Okla.), 292 Pac. 887, as follows:

"The fingerprints of Stacy were found on the door of the vault. There was no other testimony tending to connect Stacy with the commission of the crime. On appeal he contended that the evidence was insufficient to sustain a conviction. In affirming the judgment of conviction the court said, 292 P. at page 887: 'We have no doubt but that the finding of the finger prints of the defendant on the door of the vault, with the further proof that defendant did not have access to and had not been at the place burglarized so that the prints could be accounted for upon any hypothesis of his innocence, is a circumstance irresistibly pointing to his guilt. In conformity to decisions of the courts in many states, we take judicial knowledge that there are no two sets of finger prints exactly alike.' "

While we have by no means exhausted the authorities in our discussion which we have read on the subject in which there seems to be no conflict, it does appear that sufficient has been written in this opinion to reasonably warrant the conclusion that we may now, in recognition of the development of methods for lifting, magnifying, recognizing and classifying finger prints, say that a jury is warranted in accepting the testimony of one qualified to give it when the only evidence of identity against an accused depends upon the resemblance between finger prints. Such evidence, when believed by a jury, is considered sufficient to support a conviction.

An interesting deduction may be made from the evidence of the State's witness in this case on a phase of the subject which we have found in none of the decisions nor the articles which we have read on the subject. He says that practically all identical twins in the United States have been fingerprinted and that no two have been found who have identical finger or palm prints. It is a known fact that many of these cannot be so described as to distinguish one from the other; that even the parents in many cases have difficulty in distinguishing them, and, yet, it appears that the identity from the finger print is easy and positive.

It has occurred to us that instead of the State being called upon longer to offer proof that no two finger prints are alike, it may now be considered in order for those taking the opposite view to assume the burden of proving their position.

The presence of appellant's finger print on the portion of the glass covered by the molding is inconsistent with his innocence. It could not have been placed there while the pane was in the door and the molding in place. The evidence was sufficient to authorize the jury's finding. This court has no right to disturb their verdict. The judgment is affirmed.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

It is appellant's contention in his motion for rehearing, as it was on original submission, that the evidence of identity of the finger print of appellant was not sufficient to sustain the verdict of the jury.

In determining this question we think the first requisite is to show beyond a reasonable doubt that the finger print found on the glass was placed there by the burglar at the time of the burglary, excluding the hypothesis that it might have been innocently imprinted on the glass at a time prior to or subsequent to the burglary. On this point we think the evidence leaves no room for doubt. The glass was held in the door by a molding. Along the glass at the edge of the molding was a showing of paint. The finger print found was on the glass at a point which had been covered by the molding, hence impossible to find its way there until the molding was removed. Therefore it seems conclusive that when the glass was removed

in order to effect an entrance to the building the burglar at that time left his finger print on the glass after removing the molding. The evidence excludes the idea that appellant ever handled the glass subsequent to the burglary.

The entire finger print, (thumb print, in fact,) was not shown on the glass, but only about one-fourth or one-fifth. It is argued by appellant that not a sufficient print was on the glass to furnish a conclusive comparison with the known thumb print of appellant. Here we must look to the evidence of the expert for we, as well as the jury, are dependent on the statement of witnesses who are informed upon the point. He testified as follows: "Yes, more than a sufficient number of the characteristics as shown by the known print appeared in the other to afford *positive identification*. All of the ridge characteristics within that area were apparent in both of these impressions. *It is not necessary that we have the entire pattern to identify a finger print.*" (Italics ours.)

The niceties and scientific methods employed by the expert in the comparisons of finger prints is an intricate and engaging subject, but here again the courts must rely largely on the conclusions of the experts rather than upon the varied reasons which form the basis for such conclusions. The known finger print (or thumb print) of appellant was taken on cards and furnished the expert, together with the print on the glass. The witness testified further:

"I made a comparison of the print I found on the glass and the prints that were turned over to me by the Sheriff of Hamilton County. From that comparison I arrived at a conclusion as to the similarity of the prints. That finger print made on that card and on this glass were made by the same person. * * * I have said that the latent impression on the glass was identical with the impression on this card in the space provided for the right thumb."

It has long been held that evidence of finger print comparison was admissible as a circumstance upon the question of identity, but the point here important is, does the weight of authority in the United States regard it as conclusive proof of identity under conditions here shown to be present? Our investigation leads us to conclude that where the evidence, as here, shows the finger print found at the scene of the crime was left there by the criminal at the time the crime was com-

mitted, thereby excluding the hypothesis that it might have been placed there innocently prior to or subsequent to the commission of the crime, and the evidence further shows that said print is identical with known prints of accused, that such evidence satisfies the law and excludes every reasonable hypothesis save guilt of the accused.

We think it beyond our province to disturb the verdict of the jury based upon testimony satisfactory to them as to the guilt of appellant.

The motion for rehearing is overruled.