416 P.2d 52 (1966)
Lyman David LESTER, Plaintiff in Error,
v.
The STATE of Oklahoma, Defendant in Error.
No. A-13868.
Court of Criminal Appeals of Oklahoma.
June 15, 1966.
Rehearing Denied July 19, 1966.
As Amended July 22, 1966.
Joel L. Carson, Hamilton & Carson, Oklahoma City, for plaintiff in error.
Charles Nesbitt, Atty. Gen., Joseph C. Muskrat, Asst. Atty. Gen., for defendant in error.
*54 NIX, Judge.
Plaintiff in Error, Lyman David Lester, hereinafter referred to as defendant was charged in the District Court of Oklahoma County with the crime of Burglary Second Degree. He was tried, found guilty, and his punishment assessed at three years in the penitentiary. From that judgment and sentence he has perfected his appeal to this Court.
The evidence on behalf of the state revealed that Dr. Lawrence E. Silvey, who resides in Bethany, testified that on October 31, 1963, he drove his 1960 Nash Rambler home at approximately 10:30 p.m. and parked it in the rear of his home in the driveway. He stated that when he awoke the next morning at 6:30 and started to leave the house, he found the right front door of his car ajar. He noted the back seat had been ripped out, and his medical bag emptied of its contents. Since this was the third time in two weeks that this had happened, he immediately called the police, and didn't disturb the car. He testified that the articles missing from his medical bag were: 1-30cc. vial of morphine; 1-10cc. vial of dilaudid; and 1 partially used vial of demerol which had originally contained 30cc. The Bethany police arrived and took a fingerprint from the right door handle, which was turned over to the State Crime Bureau at a later date. This fingerprint was identified as belonging to the defendant.
The defense presented the testimony of a close friend, Jack Overton, an interior designer, who testified that he and the defendant went out to eat between 6:30 and 7:00 p.m. on October 31, 1963, and were together until 11:30 or 11:45 p.m., when he took defendant to his home located just off Council Road between Reno and 10th Streets. (Which is just south of the town of Bethany.) His stepfather and mother, Mr. and Mrs. Reed, testified that he arrived home at that time and went to bed around 1:30 a. m. That they next saw him at 5:15 a.m. when they took Mr. Reed to work at Aero Commander. His mother, *55 Mrs. Reed, stated she did not believe defendant left the house during the night, or she would have heard him. The defendant did not testify.
This is substantially the substance of the case presented to the jury.
Defendant's first assignment of error, labeled number three, is that he was not indicted by a grand jury. We will not discuss this at any length, as it has been fully covered in the early case of In re: McNought, 1 Okl.Cr. 528, 99 P. 241; and re-affirmed in the recent cases of Miller v. State, Okl.Cr., 407 P.2d 996, and Jones v. State, Okl.Cr., 407 P.2d 997, both handed down November 17, 1965.
Defendant's second assignment, shown as four, five and six, is that the State's Exhibit #2 was improperly admitted into evidence; alleging that it was obtained from the defendant and subsequently used against him in violation of his rights against self-incrimination.
He attempts to include the doctrine of the case of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) to apply to the taking of fingerprints. He alleges that the fingerprints on the Exhibit were obtained from the accused without advising him of his Constitutional rights against self-incrimination, and without benefit of counsel.
The Constitutional provision that a person need not give evidence which would tend to incriminate himself has been greatly enlarged upon in recent years. However, we do not find that this particular question has ever been passed upon in Oklahoma, wherein a defendant has sought to include the taking of fingerprints in this realm of self-incrimination; and we will, therefore, treat it as a case of first impression.
One early Oklahoma case, Stacy v. State, 49 Okl.Cr. 154, 292 P. 885, deals with the admissibility of fingerprints as evidence, and gives a brief history of fingerprinting.
This writer has found, after analyzing many cases from different jurisdictions  some of which will be quoted later  that fingerprint evidence is uniformly held or recognized to be admissible to prove identity.
While recognized as being circumstantial or opinion evidence, the basic reason for the universal recognition of the admission of fingerprint evidence to prove identity, is its so-called `infallibility' or conclusiveness; and we do not consider it necessary to go into a detailed discussion of the facts on which the science of identification by means of fingerprint impressions are based. Its accuracy and reliability are too well established to require any further confirmation by this Court, and we will go on to the main question of self-incrimination.
It has always, at common law and in the practice prevailing under the Constitution and the laws of our State, been permissible to put in evidence, for the purpose of identification of the defendant, testimony as to his personal appearance, his hair, his eyes, his complexion, marks, scars, teeth, his hands, and the like. Fingerprints are but the tracings of physical characteristics or the lines upon the fingers. Nothing further is required in fingerprinting than has been sustained heretofore by the courts in making proof of identification. The steps are to exhibit the fingers of the hands and to permit a record of their impressions to be taken.
The requirement that the defendant's fingerprints be taken for the purpose of establishing identity, is not objectionable in principle. In this requirement, there is neither torture, volition, nor chance of error involved. No volition on the part of the defendant is required. That is, no act of willingness, or positive action on defendant's part is necessary. Fingerprints taken, for identification purposes, from an unconscious person, or even a dead person, are as accurate as those taken from a living person.
The requirement that defendant's fingerprints be taken, causes no danger *56 that the defendant will be required to give false testimony. The witness does not testify. The defendant, whose fingerprints are exhibited, does not testify. The prints speak for themselves. No action, or will on the part of the defendant could falsify, exaggerate, produce, or create a resemblance of his fingerprints to any others; nor could he change one line in them. Therefore, there is no danger of error being committed or false testimony being offered.
Both upon sound reason and upon the authority of the cases cited herein, I am of the opinion that the taking of the defendant's fingerprints and their introduction in evidence was not a violation of the Constitution of the United States or of this State.
The proof was not the defendant's proof. He was not called as a witness. It was the proof of a competent witness based upon the record of identity as it pertained to the defendant. The Constitutional prohibition may not be used to prevent the establishment of the truth as to the existence or non-existence of certain marks of identity upon the defendant's fingers.
In the State of Arizona, in the case of Garcia v. State, 26 Ariz. 597, 229 P. 103, fingerprints were found on a glass at the scene of the crime. The defendant was told that only his signature was desired, but his fingerprints were obtained and were found to be identical with those found on the glass at the scene of the crime. The court knew these facts and held that the constitutional provision to the effect that a defendant in a criminal case cannot be compelled to give testimony against himself was not violated by taking the defendant's fingerprints against his knowledge, and using them in evidence.
In the State of California, in the case of People v. Jones, 112 Cal. App. 68, 296 P. 317, (rape case) the court permitted the introduction of fingerprints left by the defendant in fresh paint and the expert's testimony that they were identical with the inked prints of the defendant. The defense objected on the ground that the introduction of the fingerprints constituted self-incrimination, but it was held that there was no violation of the constitutional rights of the defendant.
The outstanding and leading case on denying the claims of those who object that their constitutional rights are infringed when they are fingerprinted before conviction is United States v. Kelly, 2 Cir., 55 F.2d 67, 83 A.L.R. 122. This decision, rendered by United States Circuit Judge Augustus N. Hand, is a masterful presentation of the law on the identification of arrested persons. Among other things, Judge Hand said:
"Fingerprinting seems to be no more than an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws. It is known to be a very certain means devised by modern science to reach the desired end, and has become especially important in a time when increased population and vast aggregations of people in urban centers have rendered the notoriety of the individual in the community no longer a ready means of identification. * * *
We find no ground in reason or authority for interfering with a method of identifying persons charged with crime which has now become widely known and frequently practiced both in jurisdictions where there are statutory provisions regulating it and where it has no sanction other than the common law. * * * It can be readily objected to only because it may furnish strong evidence of a man's guilt. It is no more humiliating than other means of identification that have been universally held to infringe neither constitutional nor common law rights. Fingerprinting is used in numerous branches of business and of civil service, and is not in itself a badge of crime. As a physical invasion it amounts to almost nothing, and as a humiliation *57 it can never amount to as much as that caused by the publicity attending a sensational indictment to which an innocent man may have to submit."
And, further:
"Such means for the identification of prisoners so that they may be apprehended in the event of escape, so that second offenders may be detected for purposes of proper sentence where conviction is had, and so that the government may be able to ascertain * * whether the defendant has been previously convicted, are most important adjuncts of the enforcement of the criminal laws."
The Kelly case, supra, was written in 1932, and was recently upheld and cited as controlling in the 1965 case of United States v. New Orleans Chapt., Assoc.Gen.Con. of Am., D.C., 238 F. Supp. 273.
It should be pointed out that fingerprinting is not a punishment. It is a means of identification which is useful in many circumstances, some of which relate to the enforcement of our laws. Unless the burdens that this procedure places on the individual are unreasonable, therefore, it will be upheld as one of those annoyances that must be suffered for the common good. United States v. Krapf, 285 F.2d 647, (3 Cir.1961).
The Kelly case, supra, was further upheld in even stronger language in the 1965 case of State of Louisiana v. Simien, 248 La. 323, 178 So.2d 266, 268, at pg. 270:
"During the course of the trial the State offered in evidence a print of defendant's left thumb taken shortly after he was imprisoned in the jail on February 27, and also a latent print taken from the automobile in which the young man and the girl were sitting when they were approached by their assailant; and the State identified the latent print obtained from the car with the print of the defendant's left thumb taken shortly after his arrest. Counsel objected to the introduction of this evidence on the ground that defendant had not been advised of his right to counsel at the time the thumb print was taken following his arrest, and that he was not at that time told that information thus obtained could constitute evidence against him.
The defendant bases this argument on the Fifth Amendment to the Constitution of the United States * * * which provide that no person shall be compelled to give evidence against himself.
The basis of the argument is invalid. Fingerprinting is not considered within the privilege against self-incrimination. United States v. Kelly (C.C.A.2d), 55 F.2d 67; see 8 Wigmore on Evidence, secs. 2263, 2265, pp. 378, 386, (McNaughton rev. 1961); 2 Wharton's Criminal Evidence, 12th ed. 1955, sec. 664, p. 580; Annotation, Fingerprints, palmprints, or bare footprints as evidence, 28 A.L.R.2d 1115; Model Code of Evidence (American Law Institute 1942), Rule 205(a)."
In trying to conform the ruling in the Escobedo case, supra, to the defendant's cause herein, counsel has omitted a pertinent part of that case.
In Escobedo, the court conceded that the "focus" of a police investigation had centered on the defendant when he was identified at the scene of the robbery, but this was not the whole story of Escobedo. "It was not the mere fact of `focus on a particular suspect * * * in custody', but that focusing followed by an unwarned confession from a `process of interrogations' after `the suspect has requested and been denied an opportunity to consult with his lawyer'  who was at that moment trying to see and counsel him  which was found to violate Escobedo's Sixth Amendment guarantee of counsel. It is the combination of these elements, not simply the `focus' of investigation, which is the basis of Escobedo."
To attempt to restrict the police from fingerprinting prisoners would be a ridiculous position for this Court to assume.
The police are charged with the duty of preventing crime, apprehending criminals, and gathering evidence upon which *58 they may be brought to trial. In the performance of this duty, they may use any apt and reasonable means which do not invade the rights of the accused or of other persons. Fanciful rights of accused persons cannot be allowed to prevent the functioning of the police and so jeopardize the safety of the public.
Such police measures are a strong protection for the innocent; they may prove that a person was not present at the time of the burglary, or whatever crime he is suspected of.
The right of the police to fingerprint and photograph is powerfully supported by the argument from convenience and from public interest in permitting the courts to learn the truth of the questions at issue. The right is also upheld by custom. The police in large cities of this State and throughout the country for years have measured, photographed, or fingerprinted prisoners before trial; and their authority to do so has been seldom questioned, and, so far as this Court can determine, only once denied by the judgment of a court.
Defendant further alleges that a proper foundation for the introduction of the Exhibit was not presented. Counsel objected to the Exhibit on pg. 45 only on the grounds that accused wasn't advised of his rights, which has been fully dealt with above. This Court has held repeatedly, as in Smith v. State, Okl.Cr., 378 P.2d 790:
"An objection to alleged errors committed during the trial must be made in apt time, so as to allow the trial court to rule upon the objection before action is taken. It is too late to complain after the trial is ended."
Defendant next complains as to the physical structure of the Exhibit, to wit: That the card had a master number printed on it; had the words "Oklahoma City Police Department" and other identifying marks printed and written on said card; which, he alleges, seems to identify one who had been arrested for a criminal offense. This, he alleges, was for the purpose of prejudicing the jury against the defendant.
The introduction in evidence of a fingerprint record containing extraneous material which in itself is incompetent, may or may not constitute reversible error, depending on such factors as whether the material was or was not seen by the jury, or whether the objection thereto, if made, was waived by the defendant.
On checking the casemade in the instant cause, at pg. 45, the trial judge had these identifying marks covered up with cardboard, and admonished the jury as follows:
"* * * Now, Ladies and Gentlemen, of the jury, on this exhibit there have been certain matters covered up with cardboard, either because it would be improper for you to know what is covered up, or as a matter of law, so you will not remove that please. These rules are very strict. It will be admitted."
Therefore, permitting the introduction of Exhibit #2 into evidence, with the trial judge taking the precautions that he did, is not reversible error, where the record was so covered up that it was not seen by the jury. See Moon v. State, 22 Ariz. 418, 198 P. 288, 16 A.L.R. 362; and State v. Viola, Ohio App., 82 N.E.2d 306, app. dismd. 148 Ohio St. 712, 76 N.E.2d 715, cert. den. 334 U.S. 816, 68 S.Ct. 1070, 92 L.Ed. 1746.
In defendant's next assignment, shown as seven, eight, and nine, he complains that the witness, Paul Sterling was not qualified by law to certify Exhibit #2 of the State, as a record maintained in the office of the State Bureau of Investigation; further alleging that this is the duty and responsibility of the "Custodian of Records." This is refuted in Paul Sterling's testimony at pg. 49:
"Q. What is your position?
A. I am a technician; a finger-print technician.
Q. Now, I ask you if there are on file finger-prints in your office?
A. Yes, sir.

*59 Q. In whose charge are those finger-print files?
A. Our superior there, Identification Chief. The Chief Identification Officer is Paul D. Boyd. He is Chief Identification Officer.
Q. What is your relation with Mr. Boyd?
A. I am directly under Mr. Boyd.
Q. Are you regularly employed in that office?
A. Yes.
Q. And as such do you have access to the files?
A. Yes.
Q. As your official duty?
A. Correct, sir."
And, on cross-examination, at pg. 52:
"Q. Mr. Sterling, if the State of Washington wrote to the Oklahoma State Crime Bureau for a specimen of fingerprints of any individual, could you send that print back and certify to the fact that you are the keeper of the records? Is that part of your official duties?
A. Yes, it is.
Q. You do that in the daily course of business.
A. Every day for twenty-four years."
We, therefore, do not find any merit in this contention, as the witness was sufficiently qualified for the testimony he gave concerning the records on file; and concerning the comparison of the fingerprints.
Defendant alleges that the trial court erred when it allowed Mr. Sterling to testify as to his conclusion, instead of his opinion as to the comparison of the finger-prints. He refers to the following testimony:
"Q. Now Mr. Sterling, did you make a comparison of State's Exhibit 1, with State's Exhibit No. 2?
A. Yes, sir.
Q. What were you able to determine from that comparison?
THE COURT: No. Was he able to form an opinion?
Q. Were you able to form any opinion from that examination and comparison?
A. Not an opinion. I did make a positive identification but not an opinion.
* * * * * *
Q. Mr. Sterling, you have testified you made a comparison between the two prints?
A. I have made a comparison yes.
Q. Did you reach a conclusion?
A. I did, sir.
Q. Based upon the examination you made of the two prints, what was your conclusion?
A. That this latent finger-print matches the right thumb of David Lyman Lester, whose files are in our Bureau."
There is some controversy regarding the opinions of experts on matters of comparison of finger-prints, palm prints, and bare foot-prints, which seem to relate to the form in which the expert must state his opinion. The usual practice is for the witness to testify to his belief or opinion that the prints compared by him were or were not made by the same person, but according to some courts there is no rule of law which prevents a witness from testifying positively upon the subject. According to this view, such experts may state positively that prints given them for comparison were made by the same person.
However, in Oklahoma, in the case of Braley v. State, 54 Okl.Cr. 219, 18 P.2d 281, it was stated that an expert witness should express an opinion as to the identity of fingerprints rather than state positively that fingerprints found on the cap of a stolen automobile were those of defendant. But, was not held to be reversible error.
This Court favors a broadening of this rule: That while the better practice *60 would be for the witness to state an opinion that the prints compared by him were or were not made by the same person; but, if the matter before the court for determination is one in which opinion testimony, either lay or expert, is necessary or proper, the witness may express his opinion either as to the possibility, probability, or actuality of the matter of fact about which he is interrogated, and the answer will not be an invasion or usurpation of the province or function of the jury, even though it passes upon an ultimate fact which the jury must determine.
Defendant's assignment number ten is that the closing argument of the assistant county attorney contained a statement which was prejudicial to the defendant, which he alleges to be sufficient to cause a reversal. The entire argument is now shown in the record, and only the statement of the trial judge, and the objection of defense counsel wherein he repeats the objectionable statement, is shown.
This Court has repeatedly held as in the recent case of Sharp v. State, Okl.Cr., 407 P.2d 593:
"Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury, and enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks, and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel."
This Court has carefully considered the record in this cause, and find no error sufficient to cause reversal. The judgment and sentence of the trial court is, therefore, affirmed.
BUSSEY, P.J., and BRETT, J., concur.