**Leo Darrell CHANDLER, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–15687.**

Court of Criminal Appeals of Oklahoma.

Sept. 13, 1972.

Rehearing Denied Sept. 29, 1972.

Mac Oyler and John R. Smith, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Gary M. Bush, Asst. Atty. Gen., for appellee.

SIMMS, Judge:

Appellant was initially convicted in the District Court of Oklahoma County, Case No. 33412, Robbery with Firearms, and sentenced to 99 years in the penitentiary, on December 14, 1967, in accordance with jury verdict. This conviction was Reversed and Remanded by this Court on September 17, 1969, our Case No. A–14,808, cited as Okl.Cr., 461 P.2d 983.

Appellant was brought to trial on this charge a second time, on October 21, 1969, found guilty, and his punishment assessed at 50 years in the penitentiary by the jury. It is from the judgment and sentence imposed following his second trial that this appeal has been lodged.

At trial of the case now on appeal, Roger Earl Allison testified he was an employee of a Safeway Store at 50th and Meridian in Oklahoma City, on July 6, 1967. That at approximately 12:25 P.M., a man whom he identified as the defendant at trial, held a gun on him, gave him a

TG&Y sack, and was told to "fill it up." The amount taken in the alleged robbery was $1,541.00. Allison stated he observed the defendant for approximately five to ten minutes and that the store was well lighted.

Mrs. George Summers, Jr., testified that she was shopping at 39th and Portland, in Oklahoma City, a little before noon on July 6, 1967. She parked her car, an aqua Malibu Chevrolet, in front of Hagee's Grocery Store, and went in. When she came out of the store several minutes later, she saw a male person driving her car away. She called the police and reported the car stolen. At trial, she identified a picture of the automobile as representing a photo of her automobile.

Warr Acres Police Officer Tom Swanson testified that shortly after noon, July 6th, he received a call over his police radio with reference to a stolen 1964 Chevrolet Malibu, aqua-green. Officer Swanson was a passenger in a police car being driven by Chief Nelson Beckett. Swanson related that the officers positioned themselves at the intersection of 50th and Meridian, and saw this automobile leave a Safeway parking lot and turn east on N.W. 50th Street. They followed the Chevrolet automobile, turning on their red lights, and gave chase as the car sped away from them. The witness identified the picture of the car as the same car they were chasing. Swanson testified that when they first started chasing the Chevrolet, it was because of a stolen car report, but as they were following it, they received a report of the armed robbery at 50th and Meridian that had just occurred. After the pursued Chevrolet was eventually stopped, Swanson related that he chased the defendant on foot, firing two warning shots in the air, at which point in time, the defendant turned and pointed a gun at the officer. The officer dropped to his knees, and the defendant ran across a field into an apartment complex, where he eluded the officer. Swanson found a man's coat, State's Exhibit No. 3, lying on the ground in the courtyard of the apartment complex. He

identified State's Exhibit No. 3 as the coat being worn by the defendant at the time of the chase.

The testimony of Warr Acres Police Chief Nelson Beckett was generally the same as Swanson's. He identified the defendant as the man he saw running from the Chevrolet Malibu automobile which had been reported as stolen.

Oklahoma City Police Officer John Graham testified that in response to an armed robbery call, he went to 39th and Portland, in Oklahoma City, where he assisted Warr Acres Police Officers. He went to the area of 42nd North Terrace, "where the street curves into 42nd Street" at which point he parked his cruiser, alighted from it, and went on foot into the area. He discovered a blue canvas bag in a garbage can located in the yard at 4303 N.W. 42nd Terrace. The blue canvas bag contained a TG&Y sack and $1,541.00 in currency, a loaded .38 cal. revolver, and a loaded .25 cal. automatic pistol. That at this location, he was handed a sports coat by Warr Acres Police Officer Tom Swanson.

Irvin R. Box, who was employed by the Oklahoma City Police Department on July 6, 1967, testified he investigated the reported armed robbery at 50th and Meridian. He parked his automobile at 4303 N.W. 42nd Terrace and proceeded to the backyard where he observed Officer John Graham, who had in his possession a blue cloth bag. He testified this appeared to be the bag introduced in evidence. Box climbed over a fence into the backyard of 4302 June Street. He related that he searched the residence, and as he was coming back out into the backyard from the residence, he noticed a knee protruding from between two garbage cans. He drew his pistol, told the person to "Come out with their hands up." There was no movement, so the officer fired two shots into the air, and again told the person to come out with hands up. He related that at that point in time, the defendant raised his hands in the air and said "Don't shoot." Defendant was

then placed under arrest, handcuffed, and searched. Box stated that defendant possessed a false drivers license issued in the name of Charles Anderson, and did not tell the officers that this was not his true name. Box further related that the defendant gave the name "Charles Anderson" when defendant was booked into jail.

Defendant assumed the witness stand to testify in his own defense. He stated that he was 33 years of age and a commercial artist. That he had four prior felony convictions: (1) Dyer Act, 1954, in Texas; (2) Burglary, 1955, Texas; (3) Burglary, 1957, Texas; and, (4) Attempting To Pass a Forged Instrument, 1965, Texas.

He further stated that he first met Charles Richard Anderson in Ft. Worth, Texas, one and one-half years before this robbery occurred. He testified that he was living in California when Anderson called and said he could get a job as an artist in Chattanooga, Tennessee. Defendant left immediately and joined Anderson in Ft. Worth, where he left his car, and together they started for Tennessee. Appellant stated that Oklahoma City was not their destination, but that Anderson had a friend here and they spent several days in Oklahoma City.

Chandler told the jury that on the day of the robbery, he and Anderson were sitting in the parking lot at 39th and Portland, discussing several ways they could make some quick money, such as employing a "short change" scheme, and another, the "lawn-mower gag." That he dozed off in the back seat of the car and Anderson awakened him later and said "Let's go." Defendant "noticed" he had another car and figured where he got it. Chandler testified he immediately got in the back seat and laid down. Chandler told the jury the next thing he knew, the police were chasing them and when Anderson slowed down, he jumped out and started running. He stated that he looked back when he got around some apartments and saw Anderson running in the same general direction he was. He saw Anderson stop, turn around and point a gun. Anderson then joined

Chandler and they ran together, with Anderson carrying a bag. When defendant and Anderson "split," he saw Anderson put the bag in a trash can. Chandler then tried to hide in a back yard.

Chandler testified that he did not rob the store, nor did he aid or abet in the commission of the robbery. He testified he didn't know what had happened until *after* a line-up.

Chandler admitted having rubber tips in his pockets, which the officers found at the time of his arrest, for the purpose of keeping his fingerprints off anything they might have stolen to sell. He testified, however, they never got the chance to use them.

On cross-examination, defendant admitted giving a false name at the police station. As well, he admitted purchasing a .25 cal. automatic pistol at 109 West Sheridan, Oklahoma City, which was found in the sack containing the money.

Chandler further testified that he told the officers he had come to Oklahoma City with a Jerry Don Lane, and that Jerry Don Lane was with defendant in the automobile when it was being chased and when he jumped from it. He admitted having the drivers license of Charles Anderson on his person with his (Chandler's) picture pasted on it. And that the reason he pasted his own picture on Anderson's drivers license was so he could purchase the .25 cal. automatic. The reason for the purchasing of the automatic was that Chandler was worried about his wife in California, and bought the gun to mail to her.

He denied giving a statement to Officer Legg that "All he was guilty of was driving the car."

In rebuttal, the state called Officer Jerry Legg of the Oklahoma City Police Department, who testified that he had a conversation with the defendant, who at that time was known to him as Charles Anderson, on the afternoon of the robbery. That this conversation took place at the police station with two other officers present. Legg advised defendant of his constitution-

al rights. Chandler did not reveal his true name until sometime after the questioning began. Legg stated that the defendant told them he was with another man, Jerry Don Lane, at a shopping center at 39th and Portland. In the conversation, Chandler told the officer that they had gone there where they took the car and that during the commission of the robbery, defendant had been lying in the back seat. Defendant told the officer that after the robbery he remained in the back seat until the police officers had passed the car, at which time he ran and hid and was subsequently apprehended.

Officer Irvin Box, called in rebuttal, testified that defendant told him, after apprehension, and on the way to the police station, that all he was guilty of was *driving the car*.

■ Appellant's proposition number one complains of error of the court in overruling the defendant's motion to quash the jury panel.

In support of his motion to quash the jury panel, appellant called five witnesses to testify. In substance, the testimony of the witnesses disclosed that the names contained in the jury wheel from which the jury panel had been selected to try defendant's case all came from the tax rolls comprised of those people who had filed for Homestead Exemption. Most importantly, the testimony revealed that if a person did not owe any taxes after deducting Homestead Exemption, his name would not go on the jury list, therefore would not be in the wheel. Renters, and those people who paid only Personal Property Taxes, likewise, would not be in the jury wheel.

The record of this Hearing indicates that appellant's case was tried to the jury some twelve days after this Court's opinion in Porter v. District Court of Oklahoma County, Okl.Cr., 462 P.2d 338, decided on October 8, 1969. However, the names of prospective jurors summoned for the jury panel on which appellant's case was set for trial, were drawn from the wheel prior to the date of the decision in *Porter*, supra.

In *Porter*, supra, we held that the placing in the jury wheel of the names of those persons who filed for and paid a tax after Homestead Exemption, and none others, was in violation of 38 O.S.1961, §§ 18, 33.

In his brief, the Attorney General concedes that the manner of selection of the jury panel in the instant case was the exact manner which was condemned in *Porter*, supra, however, the Attorney General emphasizes that the burden is upon the individual defendant to prove that he has been prejudiced by the manner of selection or there is no predicate for finding of reversible error.

In *Porter*, supra, this Court stated:

"We therefore conclude that the jury panel in the instant case was not selected from a list compiled according to the requirements of 38 O.S.1961, §§ 18 and 33. However, at the same time, the petitioners have not shown this Court how they are prejudiced by the procedure used to draw up the list of prospective jurors or how trial by a jury drawn from said list would deny them the right to a trial by an 'impartial jury' guaranteed in the Oklahoma Constitution, Article II, Section 20. Since several defendants other than these petitioners have been tried by petit juries selected from the same jury panel in question, and since other defendants have undoubtedly been convicted before juries selected in a similar manner, we conclude that it is not necessary to void a proceeding before a jury so selected unless the accused can convince this Court that they were in some way prejudiced. *The fact that tax payers, other than those with homestead exemptions, were not included on the jury list does not show prejudice.* An accused is not entitled to have a representative of such a group, or any group, present on his jury. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1964). Absent a showing of prejudice, petitioners are not entitled to prohibition from trial before a jury selected from this panel."

Appellant, in the case at bar, has failed to demonstrate how he was prejudiced by the procedure used to summon the panel of prospective jurors, from which his trial jury was selected. We have carefully examined the trial transcript of the case, including, the entire voir dire examination of prospective jurors. We are unable, to glean from this record, any item of testimony or evidence indicating that the defendant was, in fact, prejudiced by the method of selection of the jury panel.

We therefore conclude appellant's first proposition of error to be without merit.

■ Appellant's proposition number two relates to alleged improper voir dire examination of the jury by the prosecutor which prejudiced the jury as to guilt and punishment.

According to the record, the trial court permitted the assistant district attorney, over defendant's objection, to question each juror on voir dire examination that in lieu of qualifying them for the death penalty, if they found this was a proper case, would they consider a "lot of years." The prosecutor went on to advise the jurors during voir dire, that they could give him 500 years, 300, 150,—any amount you want to give. Defense counsel properly preserved the question by entering a timely objection, exception, moving for a mis-trial, and requesting the court to admonish the jury. The court, after the request to admonish had been made by defense counsel, made the following statement to the jury:

"Ladies and gentlemen of the jury, as the court has previously stated to you, it will be your duty to hear the evidence of witnesses sworn in open court while court is in session and render a fair and impartial verdict as between the state and this defendant. The court will instruct you as to the law which is applicable which you will have to follow in your deliberations. As to any sentence that could possibly be imposed in this case, that will be a matter in your discretion based on the evidence which

you hear, if it ever reaches the point that it is material, and at that time the court will fully instruct you as to the law relating to such matters. Proceed."

We feel the trial court skillfully excised the attempted "prosecutorial harpoon" which was attempted to be inserted in the minds of the jurors by the assistant district attorney. This is borne out by the fact the jury returned a verdict fixing the punishment at 50 years, rather than a large number of years inquired about by the prosecutor of the prospective jurors.

We find appellant's situation quite analogous with that in Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed. 2d 797. Therein, the Supreme Court of the United States wrote:

"The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. [citations omitted] We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily 'prosecution prone,' * * *."

Appellant next contends, under proposition three, that the trial court erred in admitting the in-court identifications which he alleges were tainted by unconstitutional police line-up in which the defendant appeared. More particularly, appellant contends that he was denied the right to counsel, at the line-up, and as well, he was not advised of his Fifth Amendment rights prior to the time appellant submitted to the line-up.

This Court, in Thompson v. State, Okl. Cr., 438 P.2d 287 (1968) set out in minute detail the guidelines applicable to line-ups as required by the Supreme Court of the United States in Wade v. United States (1967), 388 U.S. 218, 87 S.Ct. 1926, 18

L.Ed.2d 1149. In *Thompson,* supra, we stated:

"The suspect should be advised of his right to be represented by counsel and to have counsel present if he so desires. *He should be further advised that he does not have a right to refuse to participate in the lineup.*" (emphasis added)

In *Wade,* supra, the Supreme Court of the United States held that it was not, per se, violative of an individual's Fifth Amendment rights to compel him to appear in a line-up for purposes of identification.

█ In his brief, appellant stresses the significance of the insertion of the word "evidence" in Art. II, Sec. 21, of the Oklahoma Constitution as compared with the use of the word "testimony" as used in the Fifth Amendment of the Federal Constitution. He argues that to appear in a line-up compels one to give "evidence" against oneself as opposed to giving "testimony" against oneself. The United States Supreme Court in upholding the right of law enforcement to require a suspect to appear in a line-up as being non-violative of the Fifth Amendment is based upon the fact that no testimonial utterances are required. Nonetheless, we feel that appearing in a line-up is analogous to compelling the suspect to submit to a fingerprint exemplar. In this connection, this Court has held that the taking of fingerprints from a suspect does not violate the privilege against self-incrimination. See, Lester v. State, Okl.Cr., 416 P.2d 52.

We therefore conclude that the requiring of a suspect to appear in a line-up, which is held in conformity with the general guidelines of *Wade* and *Thompson,* supra, is non-violative of the privilege against self-incrimination as contained in either the Fifth Amendment of the Federal Constitution or Article II, Section 21, of the Oklahoma Constitution.

In addressing itself to the question of an accused's right to counsel at a pre-trial line-up, this Court in *Thompson,* supra, did not differentiate between a line-up conducted prior to the filing of an indictment or information and a post-information or post-indictment line-up.

█ In narrowing the per se exclusionary rule as set out in *Wade,* supra, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1926, the Supreme Court of the United States held in Kirby, v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411, that the Sixth Amendment right to counsel did not attach at a pre-information or pre-indictment line-up, where the suspect was exhibited to identifying witnesses. Citing a long line of constitutional cases which were the progeny of Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, the Supreme Court held in *Kirby,* that a person's Sixth and Fourteenth Amendment right to counsel attached only at or after the time that adversary judicial proceedings had been initiated against him. That learned Court emphasized that the right of counsel attached at the time of arraignment, and not before.

█ Words of caution directed at prosecutorial personnel are indicated at this point for even though, under the authority of *Kirby,* supra, the right to counsel does not attach until the filing of an indictment or information, *Kirby* does not give to law enforcement the unbridled right to conduct line-ups in any manner they may feel fit. For in *Kirby* we find the following language in which this Court concurs and adopts:

"What has been said is not to suggest that there may not be occasions during the course of a criminal investigation when the police do abuse identification procedures. Such abuses are not beyond the reach of the Constitution as the Court pointed out in Wade itself, it is always necessary to 'scrutinize any pretrial confrontation.'" 388 U.S., at 277, 87 S.Ct. at 1932.

"The Due Process Clause of the Fifth and Fourteenth Amendments forbids a lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification. Stovall v. Denno, 388 U.S.

293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Foster v. California, 394 U.S. 440, 89 S. Ct. 1127, 22 L.Ed.2d 402. When a person has not been formally charged with a criminal offense, *Stovall* strikes the appropriate constitutional balance between the right of a suspect to be protected from prejudicial procedures and the interest of society and the prompt and purposeful investigation of an unsolved crime."

■ Although we recognize that under the authority of *Kirby,* supra, there is no constitutional right to counsel at a pre-indictment or pre-information line-up identification, we strongly feel that better procedures require that before a line-up is conducted, the suspect be given the right to contact an attorney of his choice, or be informed that one will be called if he is unable to hire one, for in this suggestion, lies the ultimate safeguard against the abuses which *Stovall* and *Foster* attempt to negate.

Prior to the jury receiving any evidence in the trial of the case at bar, the court, in the absence of the jury, conducted an extensive hearing to determine if the purported in-court identification to be made by the victim of the robbery fell within the guidelines as established by *Wade* and *Thompson.* Evidence adduced during this hearing indicated that the person who was robbed observed the defendant over a period of approximately five minutes in broad daylight. The victim further testified positively that his identification was based upon what he observed at the time of the robbery and not based upon his observation of the accused in a line-up at the police station. The record further shows that all persons appearing in the line-up were of the same general height, weight, and build; and further, that the accused was in no way singled out during the line-up procedures.

In connection with the in-court identification made by the victim of the robbery, a question arises because the victim did not identify the defendant at the initial line-up but on the following day, called the police and notified the officers that the person who committed the robbery was "the number three man" in the line-up. Defendant was the number three man.

Scrutinizing the testimony taken at the evidentiary hearing, we find, however, that no suggestions, mug shots, or indications were made to the victim that the "number three man" was, in fact, the person arrested for the robbery. In explaining the delay in identification, the victim simply stated that he wanted to be sure of the identification.

■ We also note that all persons appearing in the line-up, in addition to their being of the same physical characteristics, were dressed in civilian clothes, however, each of the persons in the line-up was required to place a hat upon his head in the presence of the identifier. Requiring persons in a line-up, and more particularly an accused, to don clothing or a hat during line-up procedures is not violative of his Fifth Amendment rights. United States v. Ball (1967, CA 6, Ohio), 381 F.2d 702, cert. den. 390 U.S. 962, 88 S.Ct. 1066, 19 L.Ed.2d 1161.

Appellant also contends that he was wearing the same clothing that he had been wearing all day. We assume that by emphasizing this point, he means to say that causing him to wear the clothing which he was wearing at or near the time of the robbery caused the line-up to be suggestive in nature. We point out, however, that the record indicates that all persons, according to the testimony of Officer Swanson, were dressed in sports coats and similar civilian clothing. The record is devoid of any suggestion that the clothing appellant was wearing at the time of the line-up was distinctive enough to set him off from the other participants in the line-up.

■ From a review of the totality of circumstances surrounding the line-up, we can only conclude that there was no "fundamental unfairness" in the method in which the line-up was conducted. On the contrary. We find that the line-up passes the test of *Wade* and *Thompson,* therefore is not ground for error.

■ Under his proposition four, appellant contends the court erred in refusing to instruct the jury on appellant's theory of defense. Appellant's requested instruction number seven involved the question of whether defendant aided, abetted, or participated in the robbery; his requested instruction number nine dealt with the issue of whether defendant was asleep and unaware during the robbery that was being committed; and requested instruction number ten involved the question of evidence which could have two constructions, in which the jury should give the defendant the benefit of the doubt.

The verbatim instructions given to the jury by the court covering defendant's requested seven, nine, and ten are as follows:

"No. 9. The defendant has interposed in this case as one of his defenses what is known in law as an alibi. That is, the defendant was in the back seat of an automobile at the time of the commission of the crime charged. The law is that such a defense is proper and legitimate and you should consider all of the evidence bearing thereon, whether introduced by the State or the Defendant, and if after a careful consideration of all the evidence in the case you entertain a reasonable doubt as to whether the defendant was present at the time and place where the crime was committed, if it was committed, then and in that event the jury should give the defendant the benefit of the doubt and acquit him.

You are further instructed that the defendant maintains that another person committed the crime charged. If you find that another person committed the robbery with firearms as alleged without the knowledge of defendant, or should you entertain a reasonable doubt thereof, you should acquit the defendant of the offense charged in the information."

"No. 10. Should you find from the evidence under the instructions beyond a reasonable doubt that the defendant is guilty of robbery with firearms as charged in the information, and as defined in these instructions, then you shall find the defendant guilty as charged, but if you do not so find, or should entertain a reasonable doubt thereof, or should you find that the defense of alibi or that another person committed the crime without the defendant's knowledge as defined in these instructions, has been established, or should you entertain any reasonable doubt thereof, then in either of said latter events, you shall find the defendant not guilty."

■ These quoted instructions thoroughly set forth the theory of defense and if the instructions as a whole fairly and correctly state the law applicable to the case, the defendant cannot complain of the failure to give particular requested instructions. Also, where the court's instructions to the jury completely, accurately, and properly state the law, both as to the prosecution and the defense, in the light of the evidence presented, it is not error to refuse to give additional requested instructions on defendant's theory. York v. State, Okl.Cr., 449 P.2d 927 (1969).

We find no error in the court's instructions, nor the refusal to give appellant's requested instructions.

■ Finally, appellant urges prejudicial argument to the jury by the prosecutor in his closing summation. It is needless to burden this opinion with the exact recitation of the complained-of argument. Suffice it to say, the complained-of argument was either a fair inference drawn from the testimony given at trial or statements the district attorney made were in reply to remarks of defense counsel. Neither of these circumstances constitute reversible error. Williams v. State, Okl.Cr., 475 P.2d 622 (1970); Tilford v. State, Okl.Cr., 437 P.2d 261 (1968).

After carefully examining the entire record, the transcripts, and briefs, we can but conclude there was neither fundamental nor prejudicial error committed in the trial

of the case. Therefore, the judgment and sentence of the trial court is, in all respects, hereby affirmed.

BUSSEY, P. J., and BRETT, J., concur.