**Alvin Eugene WILSON, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–75–710.**

Court of Criminal Appeals of Oklahoma.

Nov. 12, 1976.

Rehearing Denied Dec. 14, 1976.

Bill Barksdale, Rainey, Barksdale & Barksdale, Okmulgee, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Joe Mark El-kouri, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Alvin Eugene Wilson, hereinafter referred to as defendant, was tried and convicted in the Okmulgee County District Court, Case No. CRF–74–58, for the offense of Robbery With Firearms. The defendant was sentenced to serve a term of five (5) years' imprisonment. From said judgment and sentence, the defendant has perfected this timely appeal.

The first witness on behalf of the State was Mrs. Billie Walker who testified that on the day in question the defendant came into her store at approximately 9:45 a. m. and purchased a package of cigarettes. She further testified that her store is approximately 15 to 18 miles from the store subsequently robbed. She finally testified that, to her knowledge, on the day of the robbery the defendant was driving a 1966 or 1968 red Ford pickup.

The next witness on behalf of the State was Mrs. Lena Henson. She testified that she and her husband operated a store and service station located four miles west of Beggs, Oklahoma, in Okmulgee County, Oklahoma. She testified that on the 14th day of March, 1974, she opened the store at approximately 8:30 a. m. She then testified that a man, driving a red Ford pickup, came to her store and purchased $1.56 worth of gasoline, and as she walked back into the store to place the money in the cash register she turned around and saw the man holding a gun. Upon his demand for the money, she turned over to him approximately $100.00 in fives, with a couple of tens and a few ones. After being told not to use the telephone, the robber left the premises in a red Ford pickup, headed in a westerly direction. At this point the witness identified the defendant as the person who robbed her. The victim then notified the police of the event, after which the first police officer arrived some two to three minutes later. She then gave a description of the person who robbed her to the police. She also described the weapon

used in the robbery as being a "dark colored pistol." She further testified that she handed over the money because she was afraid she would be shot. She then testified that two or three days later, in the company of law enforcement officers, she drove past the defendant's home looking for a red Ford pickup. She then testified that on the 27th day of March, at approximately 7:00 p. m., she went to the Okemah Courthouse for the purpose of viewing a lineup. She testified that the lineup consisted of six people, and that she picked out the defendant at that time. She further testified that she had not seen the defendant between the time of the robbery and the date and hour of the lineup. On cross-examination the witness described the appearance and dress of the person who robbed her. She testified that although the person was only at her store approximately five minutes she was able to ascertain that he wore false teeth. Upon further cross-examination the witness testified that when she went to the lineup she went looking for a person by the name of "Gene Wilson" and that she had heard that the person who had robbed her was the defendant, Gene Wilson.

The State then called several witnesses whose testimony was essentially the following: That they were long time residents of this area of Okfuskee County and Creek County, Oklahoma. That they were familiar with the area, the roads and streets therein, and they further testified as to the number of hours or minutes required to travel from such places as the victim's store to the defendant's house and certain corners and intersections in the two above mentioned counties.

The next witness to give essential testimony was Mr. Marian Amos of Okemah, Oklahoma, who testified that in March, 1974, he was the Sheriff of Okfuskee County, and that he received a call at approximately 10:30 to 10:45 a. m. on the morning of March, 1974, concerning an armed robbery. He further testified that he and Deputy Roy Puckett immediately

drove to the area where they eventually came upon a red Ford pickup. He further testified that upon passing the pickup they recognized the driver as Gene Wilson, of Okfuskee County, the defendant. Upon the Sheriff's automobile attempting a U-turn, the pickup, operated by the defendant, took off at a high rate of speed. While on the back country roads of Okfuskee County, they lost sight of the red Ford pickup. The witness further testified concerning the six individuals in the lineup.

On cross-examination the witness was asked many questions concerning the make-up of the lineup. He testified that the lineup consisted of six men, one of whom was 55 years of age and another who was of the Indian race. Finally, on cross-examination at page 108 of the trial transcript, the Sheriff of Okfuskee County testified:

"A. Well, to find somebody exactly that fit the general description with his age and the way he wears his hair—as long as I have known him he wore a short or his hair was real short and it would be hard to find somebody in Okfuskee County at his age the way they wear their hair now.

"Q. There was no one in the lineup of the same general description of Mr. Wilson?

"MR. MELSON: Objection.

"THE COURT: Overruled.

"Q. No one in the line of the same general description of Mr. Wilson, totally of the same general description?

"A. Not totally, no but there was two (2) or three (3) the same size and same weight."

The next witness for the State was Roy Puckett, Deputy Sheriff of Okfuskee County who testified essentially as the above witness.

The next witness for the State was Bob Walker who testified that he was the husband of the State's first witness. He testified that he had known the defendant for about 15 or 20 years and that he had seen the defendant driving a red Ford pickup on the 14th day of March, 1974, at approximately 11:40 a. m. He further testified as to the distance from where he saw the defendant to the store operated by the victim.

The next witness for the State was Miss Edith Gammill who testified that she was the wife of Olin Gammill, who was a farmer and employee of the defendant. She further testified that on or about the 14th day of March, 1974, just before the noon hour, the defendant came to her house to pay some back wages defendant owed her husband. She stated that he paid these back wages in cash, consisting mostly of five dollar bills.

The next witness for the State was Olin Gammill who testified that he was a former employee of the defendant and that he had done carpentry work for the defendant on the defendant's new home. He also testified that on or about the 13th day of March, 1974, he had telephoned the defendant asking to be paid for his carpentry work. He testified that the defendant told him that he would get a cattle check cashed and pay him the next day. The witness then testified that upon his return from a trip to Seminole, Oklahoma, his wife informed him that the defendant had come by the house and left $100.00. The witness testified that he had previously, on some occasion, seen a pistol in the red Ford pickup used by the defendant.

Gene Rice next testified that on the 14th day of March he was the Chief of Police of Beggs, Oklahoma. He received a telephone call from the victim whereby she reported a robbery at about 10:30 a. m. on the above date.

Next to testify was Everett Clayton who testified he was the Deputy Sheriff of Okmulgee County who took the telephone report concerning the armed robbery on March 14, 1974. He subsequently gave out a description of the defendant and defendant's automobile over the radio. The witness further testified that he helped to conduct the lineup and subsequently placed the defendant under arrest. He also conducted

a search of the defendant's pickup in the courthouse parking lot. Finally, he testified that as the result of a conversation he had with the wife of the defendant, she delivered a pistol to him at the courthouse. The witness then identified a Colt .32 which the defendant's wife had brought to him in the Sheriff's Office of Okmulgee County. At this time the State offered into evidence the pistol which was admitted over the objections of defendant.

At this time the State rested its case in chief. Following which the defense moved that the identification of the defendant by the victim be stricken for the reason that same was predicated upon an illegal line-up. Said motion was overruled, following which the defendant's demurrer to the State's evidence was overruled.

At this time the State was allowed to re-open over the objections of defense, for the purpose of calling the victim who testified essentially that the pistol admitted into evidence as State's Exhibit No. 2 was "about the same size and color" of the gun used by the assailant. Thereupon, the State once again rested.

The defense opened its case by calling the defendant, Alvin Eugene Wilson. The defendant testified that he lived near Okemah, Oklahoma, was married and had six children. Commencing at about 7:30 a.m. on March 14, 1974, he and his wife started hauling sand for the purpose of construction of a new house that he was building. Defendant further related the telephone call which he received from Olin Gammill concerning the debt for labor owed by defendant. The defendant then went into detail about the times and locations of his work while hauling sand and of the number of people he saw on the road while traveling back and forth from the sand pit to his home, all of which, was for the purpose of establishing an alibi defense as to his whereabouts at the time of the robbery. Defendant further testified that he left at approximately 11:00 a.m. to pick up his son from school that day and that while en route he stopped to purchase gas at a place called "Last Chance." Defendant further testified that he went to the Gammill home to pay Olin Gammill the wages due for labor. He paid Gammill approximately $100.-00 in five dollar bills, a twenty and a ten. He further testified that before picking up his child at school he changed automobiles with his wife because his pickup was not running properly. He then testified as to his employment for the last several years and the fact that he was a former policeman. He also mentioned that while he was the manager of a co-op an auditor had reported some funds missing, but that no charges were ever filed. He then denied that he owned a yellow baseball cap or having worn coveralls as described previously by the victim. The last direct testimony of the defendant concerned the fact that the reason he paid Olin Gammill in five dollar bills is that he had been saving five dollar bills for some time for the use of his children. His last statement was to deny robbing the Henson Grocery.

On cross-examination the defendant admitted that he had his hair cut prior to the lineup. After a great deal of testimony on cross-examination concerning the times, routes taken, and whereabouts of the defendant on the morning in question, defendant was then cross-examined concerning his financial condition in an attempt to establish that the defendant was "hard pressed" for money.

Defendant's wife, Phyllis Wilson, testified concerning the whereabouts of the defendant, time of day, and routes taken the morning of March 14, 1974, and was essentially the same as that of the defendant. On cross-examination the witness stated that she was unaware that her husband had saved any five dollar bills around the house.

The defense then called approximately six witnesses to establish the alibi defense. These witnesses gave various testimony concerning the whereabouts of the defendant on the morning of March 14, 1974,

particularly as to his routes taken while hauling sand. Some of the testimony was directly in support of the alibi defense, while other testimony was only circumstantially in support of said defense. On cross-examination it was brought out that some of the alibi witnesses were either related to the defendant by marriage or long time personal friends.

Following this, the defense rested.

■ For his first assignment of error, the defendant urges that the pre-trial lineup identification was conducted in a prejudicial and unconstitutional manner, not in accordance with the required safeguards set forth by the United States Supreme Court and the Court of Criminal Appeals of the State of Oklahoma. The defendant's second assignment of error urges that the In-court and pre-trial identification of the appellant by the victim was so tainted by her words and actions that any identification of the appellant would be improper and its allowance in evidence constituted reversible error. Since these assignments of error are so closely related to one another we will treat them simultaneously.

The defendant urges that the makeup and procedures used in the lineup were not in accordance with the case of *Thompson v. State*, Okl.Cr., 438 P.2d 287 (1968). In support of that argument the defendant writes a very excellent brief supported by testimony extracted from the trial transcript going to the procedure used and makeup of the lineup in the instant case. After a careful examination of the record so designated and furnished to this Court, we are not of the opinion that the lineup identification in the case at bar is so violative of the *Thompson* case, supra, as to contain fundamental error requiring reversal. Clearly the lineup was not held under ideal conditions. This Court is cognizant of the difficulties presented to law enforcement officers in their attempts to produce an ideally fair lineup in some of our smaller communities. It would have been most dif-

ficult, if not impossible, for the Sheriff to have produced six or seven individuals who matched the description of the defendant to such an extent as to make the lineup ideal in all respects, especially considering the age, appearance, false teeth, and other physical attributes of the particular defendant at bar.

A careful examination of the entire record in this case reveals no evidence at all that the eyewitness, Mrs. Henson, had been furnished or possessed any prior knowledge as to the identity of the defendant or where he would be in the lineup. She knew a name, to-wit: Gene Wilson. But she had no knowledge, other than what she had observed during the robbery, of who Gene Wilson was or what he looked like. She had seen a red pickup truck at the home of Gene Wilson soon after the robbery but there is no indication in the record that Gene Wilson was ever pointed out to her, in any fashion, prior to her selection of him in the lineup.

On the 14th day of March, 1975, the court heard a Motion to Suppress the identification of the defendant by the witness Henson which was overruled. At that time the trial court heard considerable evidence from law enforcement officers concerning the "makeup" of the lineup. At that time the trial court found that the makeup had been conducted as fairly as possible. The trial court also found that there was no indication that the lineup was so suggestive as to taint the identification of the defendant by the witness Henson. With this ruling this Court agrees. During the closing argument of the Motion to Suppress, which was held a month before the actual jury trial, the attorneys on both sides incorporated the transcript and record of the preliminary hearing by reference. At that time it was pointed out by the prosecutor that at the preliminary hearing the witness, Mrs. Henson had given the following statement:

"Q. You never saw a man that looked like him?

"A. Not like him, no." (Preliminary Hearing Tr. 90)

Obviously, the trial court felt that the witness Henson's identification was based solely on what she had observed during the offense. This Court held, in *Holt v. State*, Okl.Cr., 506 P.2d 561 (1973), dealing with an analogous fact situation in regard to identity of the robber by the victim, as follows:

" . . . After carefully reviewing the record, we are convinced the prosecuting witness did not rely on the pre-trial identification to identify the defendant at the time of trial and that the in-court identifications are based on the defendant's appearance at the scene of the crime. See *Carter v. State*, Okl.Cr., 478 P.2d 912 (1970)."

See also, *Armstrong v. State*, Okl.Cr., 541 P.2d 213 (1975) and *Green v. State*, Okl. Cr., 541 P.2d 224 (1975).

Finally, in the case of *Chandler v. State*, Okl.Cr., 501 P.2d 512 (1972), we held that we must view all the circumstances surrounding the lineup in order to test the fundamental fairness of the same. After examining the record in accordance with the rule enunciated in *Chandler,* supra, we find that the lineup was conducted in substantial compliance with *Wade v. United States*, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1969), and *Thompson v. State*, supra, and that the courtroom identification of the defendant was made by the witness, independent of the lineup.

■ As a collateral matter, the defendant asserts that he was denied his right to counsel at the pre-trial lineup. This Court has treated this issue on many occasions and the law is abundantly clear. Since the lineup was conducted prior to an indictment or information against the defendant, the presence of counsel, or effective waiver thereof, was unnecessary. See *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L. Ed.2d 411, and *Chandler v. State*, supra.

■ The defendant has raised as his next assignment of error an allegation that the court erred in submitting to the jury an instruction concerning flight. A careful examination of the record in this regard reveals that there was ample evidence at the trial to justify the trial court in submitting such an instruction to the jury. Beginning at page 72 of the transcript, the Sheriff testified that he and another deputy passed defendant in this case at which time the defendant was traveling at approximately 55 or 60 miles per hour. However, upon seeing the defendant and upon the Sheriff turning his automobile around, the defendant then fled from them at 95 or 100 miles per hour. (Tr. 74). In the instant case it is apparent that the trial court sufficiently and adequately instructed the jury concerning the burden of proof and the means and ability to identify the perpetrator of the alleged crime. It cannot be said that the trial court abused its discretion in submitting instruction number 3 and defendant's assignment is therefore without merit.

■ For his final assignment of error the defendant states that the court erred after receiving word that the jury was deadlocked, by forcing them to render a verdict by making oral comments and by giving instruction number 10.

Instruction number 10, the final instruction, was given by the court after approximately three hours of deliberation when the jury panel indicated it was deadlocked and it had not reached a verdict. Instruction No. 10 reads as follows:

"Ladies and Gentlemen of the Jury:

"I see no reason why you jurors are not as competent, are not as able, nor as likely to decide the disputed issues of fact in this case, and decide them right, as the next jury that would be called to determine such issues.

"I do not want you to understand by what I say that you are going to be made to agree, or that you are going to be kept out until you do agree. I do want you to understand that it is your duty to make an honest and sincere at-

tempt to arrive at a verdict. Jurors should not be obstinate; they should be open-minded; they should listen to the arguments of others, and talk matters over freely and fairly, and make an honest effort, as fairminded men and women, to come to a conclusion on all of the issues presented to them.

"You will please retire again to the jury room."

Counsel complains that this was an improper and prejudicial Instruction in that it intimidated the jurors to such a degree that they were forced to arrive at a decision contrary to their conscience or convictions. The oral remarks complained of are as follows:

"Well, I'm not trying to beat you in the back. I just—I'm not questioning your judgment. I just don't want to make a hasty decision. If another thirty minutes or forty five minutes of discussion or consideration might solve it, why I'd like to see it solved."

We think even the most cursory reading of Instruction No. 10, and the oral statement of the judge, clearly negate defendant's final assertion that the jury was coerced into reaching a verdict. Instruction No. 10 and the oral remarks of the judge, demonstrate the court's attempt to aid the jury in their effort to arrive at a determination of the defendant's guilt or innocence if such were possible, within a reasonable time. For similar holdings see *United States v. Winn*, 411 F.2d 415 (10th Cir.) and *Goff v. United States*, 446 F.2d 623 (10th Cir.).

We are of the opinion, and therefore hold, that this assignment of error is without merit.

For the above and foregoing reasons, the judgment and sentence appealed from is accordingly *AFFIRMED*.

BRETT, P. J., dissents.

BLISS, J., concurs.