**Quinion Ray LEIGH, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–77–201.**

Court of Criminal Appeals of Oklahoma.

Dec. 21, 1978.

Clarke L. Randall, Appellate Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Givens L. Adams, Asst. Atty. Gen., for appellee.

## OPINION

CORNISH, Judge:

Appellant, Quinion Ray Leigh, hereinafter referred to as defendant, was charged in the District Court, Tulsa County, Case No. CRF–76–87, with the crime of Robbery With Firearms, After Former Conviction of a Felony. He was convicted by a jury and sentenced to serve twenty-five (25) years in the Oklahoma State penitentiary. From said judgment and sentence, the defendant brings this appeal.

The State's evidence from the two prosecuting witnesses, David and Judith Hunsaker, established that at about 5:00 a. m. on January 13, 1976, two men forced their way into the Hunsaker apartment after inducing Mr. Hunsaker to open the door by identifying themselves as policemen. At the time

they entered the apartment, they were wearing homemade ski masks over their faces with holes cut out for the eyes. One man was carrying a shotgun and the other man, later identified as the defendant, was carrying a pistol. After entering the apartment, the intruders lifted their masks, and David Hunsaker had about two minutes to look at them in the light coming from the outside security lights through the open venetian blind of the window. While the men were frisking Mr. Hunsaker, Mrs. Hunsaker came into the living room from the back bedroom and briefly glanced at the men before she turned her head and asked them to lower their masks, which they did. The men remained masked during the rest of the time they were in the apartment. Mr. Hunsaker was made to lie on the floor where he was watched by the defendant while the other man, identified as Wooten, sexually assaulted his wife in the back bedroom for approximately 15 to 20 minutes. During this time, Mr. Hunsaker testified, the defendant took his wallet from his pants pocket. He further testified that all he could see of the defendant at this time were his pants, shoes and the pistol. Following Wooten's sexual assault on Mrs. Hunsacker, the defendant sexually assaulted her for ten minutes while Wooten watched Mr. Hunsaker and then Wooten returned to assault Mrs. Hunsaker again for about 10 to 15 minutes. The lighting in the bedroom also came from the outside security lights through a window having a raised venetian blind. While Wooten was in the bedroom the second time, the police knocked upon the apartment door and the defendant exited the apartment through the master bedroom window and Wooten exited through the children's bedroom window. During the ensuing police investigation it was discovered that Mrs. Hunsaker's billfold was missing.

According to Sergeant Tucker, of the Tulsa Police Department, about 10 to 15 minutes after receiving the description of the men involved in the incident at the Hunsaker apartment, he saw the defendant, with whom he was familiar, standing on an exit ramp off the Broken Arrow Express-

way about four or five blocks from the Hunsaker apartment. The Sergeant pulled over to question the defendant, and the defendant told Sergeant Tucker that he was hitchhiking to his mother's house and that his car had broken down in Wagoner, Oklahoma. Following a pat-down, which revealed no weapons, Sergeant Tucker told the defendant to get into his patrol unit. The sergeant told the defendant he would take him to his mother's house, but after he took him to the Hunsaker apartment because he fit the description, to which the defendant replied, "go ahead."

At the evidentiary hearing, in response to the question of whether he would have let the defendant leave after having stopped on the freeway, Sergeant Tucker replied that he would not.

Upon reaching the Hunsaker's apartment, the defendant was seated on the couch, and the Hunsakers subsequently identified the defendant as one of the men. From 10 to 30 minutes later the defendant was taken to the police station and booked.

Following an evidentiary hearing on the defendant's motion to quash the arrest, joined with a motion to suppress the evidence therefrom, and the in court identifications of both the Hunsakers, the trial court allowed all the evidence, including the in court identifications, to be admitted over the defendant's objection. Also admitted into evidence over the defendant's objections, were the wallet and billfold removed from the apartment that morning which the police recovered from the apartment manager's office of the Hunsaker's apartment complex on January 16. The manager had told the police that the wallets had been found by tenants' children, but the policemen who picked up the wallets never talked to the persons who found them.

Further evidence presented at trial over the defendant's objection was the testimony of an FBI agent as an expert witness on hair analysis. The police removed the sheets from Mrs. Hunsaker's bed and sent them, along with pubic hairs from the defendant and Wooten, to the FBI to deter-

mine if they matched. It was the agent's testimony that he had found one hair which could have come from the same source as the hair which was State's Exhibit No. 18, labeled as being the defendant's. He found none which could have come from Wooten. The agent further testified that hair analysis does not result in positive identification as do fingerprints, and that there could be other people with hair having the same characteristics as the defendant's.

Admitted into evidence for the defendant was defense exhibit number 2, a photo of the defendant taken on the afternoon of January 13, while being booked, and a stipulation as to the time recorded tape at the Tulsa Police Department on the morning of January 13, 1976, relating to the incident at the Hunsaker apartment. The pertinent parts of that exhibit are: 5:53 a. m. family fight or disturbance; 6:11 two armed men at Normandy Apartments; 6:23 white male red Ford Torino and used the name Bobby Townsend; 6:27 physical and clothing description as follows: two white males, one 6'2", brown hair approximately 30 years old wearing Army fatigue jacket; second subject described as 6'1", brown hair, approximately 30 years old; 6:30 (to Sergeant Tucker's unit) no wants or warrants on Quinion Leigh.

As his first assignment of error, the defendant argues that it was error for the trial court to allow the in court identification of the defendant by David and Judith Hunsaker. The defense contends that the initial arrest of the defendant by Sergeant Tucker was without probable cause, and being an invalid arrest, the subsequent show-up at the Hunsaker apartment and the in court identifications should have been suppressed as fruits of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The fact that an arrest did occur when Sergeant Tucker stopped on the freeway and told the defendant to get into his unit to be taken to the Normandy Apartments complex is admitted by the State in their brief. In an evidentiary hearing on the defendant's motion to quash the arrest and

to suppress all evidence resulting therefrom, including the motion to suppress the in court identification as part of the evidence proceeding from the arrest, the trial court ruled that there was no probable cause. The trial court went on to rule that all the evidence was admissible on the basis of stop and frisk. The trial court, ruling that a show-up within a close proximity of time was permissible, allowed the in court identification.

At the evidentiary hearing, the trial court had presented before it Sergeant Tucker's testimony to the effect that on the morning of January 13, after leaving a restaurant, he heard three calls on his radio. The first call was a report of a disturbance, followed a few minutes later by a call reporting two armed men at the Normandy Apartments and a third call after that containing a general description of the men involved. He further testified that some 10 to 15 minutes following the description he saw the defendant standing on an exit ramp on the Broken Arrow Expressway. It was his testimony that he heard all of these calls while traveling at about 40 miles per hour in light traffic, without making any stops in a distance which was established as being one mile and eight or ten blocks. Obviously, the trial court, as does this Court, found it impossible to correlate the sergeant's testimony with that of the timed recordings, because it ruled that there was no probable cause. The sergeant's testimony would require the court to assume that a mile and eight to ten blocks at 40 miles per hour takes over half an hour to travel, since he stated he was in his car when he heard the 5:53 a. m. call and the description came at 6:27 a. m. However, at trial, the sergeant testified that he heard the disturbance call while in the restaurant and the call about the two armed men while in his car, from a distance of at most one mile and eight to ten blocks from where he stopped the defendant. This would mean it took as long as 16 minutes to travel the distance, assuming he saw the defendant at the same time he heard the description. But he said he had from ten to fifteen minutes after the description before seeing the defendant.

The 6:23 a.m. call did not contain a description which would support a probable cause finding where it contained a description of a car and named a man other than the defendant. The sergeant, however, was unwavering in his testimony that the events occurred exactly as he described.

In *Greene v. State*, Okl.Cr., 508 P.2d 1095, 1098 (1973), this Court stated that the test for probable cause for a warrantless arrest is whether at the moment of the arrest the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information was sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The trial court properly ruled from the information before it that the sergeant was without sufficient information to warrant a belief that the defendant had committed an offense at the time of the arrest.

Nevertheless, the trial court proceeded from finding no probable cause to admitting the evidence on the basis of stop and frisk. In order to rule as it did, the trial court must have gone beyond the evidence presented before it to assume a set of facts that are unestablished in the record but which were necessary to justify the arrest and evidence therefrom. It is not the function of a trial court to assume what could have been in order to justify the presentation of the prosecution's case. Rather, as stated in *Greene v. State*, supra, "Once a warrantless arrest or search is challenged, the burden is on the prosecution to prove it was lawful." At the evidentiary hearing, the prosecution failed to establish probable cause for the arrest and did not establish a basis for the initial detention of the defendant on the basis of stop and frisk or any other grounds.

Following the illegal arrest, the defendant was transported to the victim's apartment for a show-up identification. This show-up is not admissible as evidence under the doctrine of *Wong Sun* as being "fruit of the poisonous tree." In *Wong Sun v. United States*, supra, 371 U.S. at 488, 83 S.Ct. at 417, the United States Supreme Court stated that the test for determining whether evidence from an illegal arrest should be excluded is:

> " '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint. . . .' " (Citations omitted)

Typically, the application of this test has been to exclude evidence acquired through a search made incident to an unlawful arrest or to exclude evidence of an incriminating statement made pursuant to an illegal arrest. *Greene v. State*, supra, and *Bynum v. State*, Okl.Cr., 490 P.2d 531 (1971), respectively.

The exclusionary rule has also been applied to fingerprints taken from a defendant following an illegal arrest, *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); to blood alcohol tests, *Richardson v. State*, Okl.Cr., 511 P.2d 1127 (1973), wherein the defendant, following an illegal arrest, was taken to a hospital for a blood alcohol test and then booked into jail. The illegal arrest here was exploited by the defendant's being immediately taken before the Hunsakers at their apartment in an emotionally charged environment while several police officers conducted their investigation.

The defendant was seated on the sofa and the Hunsakers came forward from the back bedroom to identify him. Mr. Hunsaker came first and immediately identified the defendant. Mr. Hunsaker then told his wife to come to the room and, in the company of her husband, she also identified the defendant. The testimony of both Hunsakers was that the defendant was handcuffed when they saw him. Mr. Hunsaker also heard an officer say that they caught him on the Broken Arrow Expressway. No precautionary measures were taken by the police to insure that neither witness' identification was influenced by the other. Certainly, the defendant was not afforded any of the safeguards of a lineup. Subsequent

to the identifications, the defendant was searched in front of Mr. Hunsaker and a stocking cap was removed from one of his pockets. Sometime while they were at the apartments, Sergeant Tucker read the defendant his rights. Undoubtedly, the on the scene show-up identification was directly a product of the exploitation of the illegal arrest.

Nor is there present in this situation an attenuation which would dissipate the taint from the show-up identification by virtue of the defendant's apparent consent in being taken to the Hunsaker's apartment. In *Sutton v. State*, Okl.Cr., 558 P.2d 1193 (1977), evidence obtained from a search incident to an illegal arrest was held admissible where the defendant had consented to the search. In *Stidham v. State*, Okl.Cr., 507 P.2d 1312 (1973), about 39 hours after the defendant's illegal arrest, after having been read his rights and on being confronted with evidence obtained independently from the tainted arrest, the defendant made a voluntary statement which was held admissible on the basis that intervening circumstances may remove an original taint. But, in these two cases the defendants by their own voluntary acts chose to waive the Fourth Amendment right against search without a warrant and the Fifth Amendment right against self-incrimination, respectively. The defendant, in the present case, by not refusing to go with the sergeant did not waive any right under the Constitution. The United States Supreme Court in *Kirby v. Illinois*, 406 U.S. 682, 687, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972), stated "that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion to give evidence of testimonial significance." In *Chandler v. State*, Okl. Cr., 501 P.2d 512 (1972), this Court held that lineup confrontations did not violate the privilege against self-incrimination. Further, in *Thompson v. State*, Okl.Cr., 438 P.2d 287 (1968), this Court recognized that the defendant does not have a right to refuse to participate in a lineup. While in *Kirby* the exhibition was at the police station and in *Thompson* a lineup was in-

volved, these cases nevertheless relate to the situation of an on-the-scene show-up where the purpose of all three situations is to achieve an identification by exhibiting the person of the accused. Therefore, the defendant herein, by his consent to being taken to the apartment, did not attenuate the connection between the illegal arrest and the show-up identification where he had no right to refuse to be exhibited and consequently, no right to waive by not objecting to the show-up.

■ Having established that the show-up identification was inadmissible, the next consideration is whether the in court identifications should also be excluded as being evidence derived from the exploitation of the initial illegality. In *Wong Sun*, the United States Supreme Court stated that the exclusionary rule applied to indirect as well as direct products of unconstitutional invasions. If the in court identifications were based on the show-up, then clearly they would be tainted so as to fall within the exclusionary rule. However, a recognized exception to evidence which otherwise might fall within the exclusionary rule is that evidence which has a source independent of the unconstitutional invasion is admissible. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and *Wong Sun v. United States*, supra. To this extent, it is possible that the in court identifications were not tainted but rather resulted from the memory of the victims at the scene of the crime, independent of the subsequent illegal arrest and tainted show-up. Therefore, this Court does not believe an automatic exclusion should be placed on the in court identifications where an on-the-scene show-up was conducted subsequent to an illegal arrest. It does not follow, however, that the in court identifications are necessarily admissible evidence. The question of the admissibility of the in court identifications turns on finding whether the inadmissible pretrial confrontation tainted the in court identifications. To support a determination that the in court identifications are not so tainted, there should be clear and convincing

evidence that the in court identification is based on the witnesses' independent observations from the scene of the crime. In the present case, there is not such clear and convincing evidence to determine that the tainted show-up could not have been the basis for the in court identification rather than the separate memories of the victims.

We begin with a consideration of the circumstances at the scene of the crime. The intruders forced their way into the apartment, brandishing firearms. In the presence of Mr. Hunsaker, they lifted their masks for what he estimated to be about two minutes. The view he had was by outside security lights coming through an open venetian blind about 5:00 a. m. on a January morning. The inside lights were never turned on. The rest of the time the men were in the apartment Mr. Hunsaker was lying on the floor. From this view of the intruders, the witness told the police that the men were clean shaven, had dark trousers and green parka-type coats; yet, he recalled no facial scars or acne. Apparent from the record is the fact that the defendant was not clean shaven, but rather looked as if he had not shaved for a few days, according to Officer Aery when he saw the defendant at the show-up about 7:00 a. m. That the defendant was not clean shaven is also depicted in the photo of him taken that afternoon. The defendant also had a scar across his face and a bad complexion. Although the witness indicated that the light was good enough for him to be able to describe the defendant, the witness failed to mention his facial features. Moreover, the witness later testified that the light was not good enough to distinguish that the jeans were not dark. Another indication of the effect of the show-up upon the witness' memory is that at trial he identified the shirt of the defendant, under direct examination, as being what the defendant was wearing both times he saw the defendant that morning. Yet, he later testified that he did not recall either of the intruders opening their coats. He further testified that he could not remember Wooten's shirt, but that he could remember and identify the defendant's shirt

because this was what he saw the defendant wearing when the police brought the defendant to the apartment that morning.

Nor does the testimony of Mrs. Hunsaker determine that her identification of the defendant was not based upon the show-up. Her testimony was that she got a glance at the intruders as they were frisking her husband. She glanced at them and then immediately looked away, requesting that they lower their masks. Her memory of the other intruder, as her husband's, is less precise than is her memory of the defendant. Yet, she was with the other intruder twice as often and for longer periods of time. She testified that during the separate incidents in the bedroom the men remained masked and while she was able to notice that Wooten had a bad complexion, she had no such recollection in relation to the defendant, although she stated that acne would be memorable to her. She also stated that she could not remember Wooten's shirt because he never opened his parka-type coat while he twice raped her.

The defendant was held at the apartment for the tainted show-up for 10 to 30 minutes, where the witnesses had ample opportunity to observe him in good lighting. It seems more probable than not from their testimony that their in court identifications were closely related to this opportunity to observe him at the show-up. Therefore, this Court cannot conclude that under the circumstances the tainted show-up did not corrupt the in court identifications. Even though both witnesses swear that their memory of the defendant is based on the scene of the crime, this Court cannot rely on these positive statements of identity under these facts where the in court identifications cannot clearly and convincingly be shown not to have been influenced by the tainted show-up following an illegal arrest. Therefore, it was error for the trial court to admit the in court identifications.

■ Moreover, under the doctrine of *Wong Sun*, the items removed from the defendant's person following the illegal arrest, and admitted into evidence as State's

Exhibits 3 through 7 and 16, were likewise inadmissible as evidence derived directly from the exploitation of the illegal arrest.

We conclude, therefore, that the arrest of the defendant was without probable cause and that the show-up was inadmissible as being an exploitation of that initial illegality, as well as the items found on his person. Moreover, since the in court identifications cannot clearly be shown to have a source independent of the illegal show-up, it was error to admit them. Inasmuch as we are reversing on these grounds, we find it unnecessary to discuss the remaining assignments of error.

Therefore, the judgment and sentence appealed from is *REVERSED* and *REMANDED* for a new trial consistent with this opinion.

BUSSEY, P. J., dissents.

BRETT, J., concurs.